Earl **BRATTON** et al.,
**Plaintiffs-Appellants,**

v.

Joel **SHIFFRIN** et al.,
**Defendants-Appellees.**

Roger **CHAPMAN** and Jeanne Chapman, **Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,**

v.

**FIRST NATIONAL BANK OF HIGH-LAND PARK, a National Banking Association, Defendant-Appellee.**

Nos. 77–2037, 77–2023.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1978.

Decided Sept. 18, 1978.

Rehearing and Rehearing In Banc Denied Jan. 11, 1979.

Christopher A. Bloom, Thomas R. Meites, Chicago, Ill., for plaintiffs-appellants.

Martin W. Salzman, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Circuit Judge, MOORE, Senior Circuit Judge,* and BAUER, Circuit Judge.

MOORE, Circuit Judge.

This appeal presents the question whether a private cause of action exists, either express or implied, under the Federal Avia-

tion Act (FAA), 49 U.S.C. § 1301 *et seq.*, against a bank that allegedly violated regulations of the Civil Aeronautics Board (CAB) governing charter tour deposits, and the officer of the bank who was to personally handle deposited funds. Contrary to the district court, 440 F.Supp. 1257 (N.D.Ill. 1977) (Grady, J.), we conclude that plaintiff-travelers, who have allegedly lost their prepayments for charter tours which, due to the insolvency of their organizer, never occurred, impliedly have a remedy for damages under section 1371(n)(2) of the FAA, 49 U.S.C. § 1371(n)(2).

## I.

The two actions now before us were commenced by a group of persons [1] consisting of individual travelers (and, in *Bratton*, some retail travel agencies) who made deposits and/or prepayments to reserve places on numerous charter tours to foreign and domestic locations. These tours were organized and marketed by Tour Travel Enterprises, Inc. (TTE), a wholesale tour operator, through, *inter alia*, its affiliated retail travel agencies, Sunshine Travel Agency, Inc., and Sunshine Travel of Nevada, Inc., all of whom are defendants. The other defendants are Gerald Mann and Richard Tauber, owners and officers of the three travel companies. The defendant-appellees are First National Bank of Highland Park (FNB), a depository which, pursuant to CAB regulations, had agreed with TTE to hold travelers' prepayments in special escrow accounts and to act as surety for TTE tours, and Joel Shiffrin, vice-president of FNB, who personally handled the tour funds.

Charter tour operators such as TTE have been the subject of recent congressional

---

* Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

1. *Bratton v. Shiffrin* (No. 77–2037) was commenced on November 18, 1976. On January 4, 1977, plaintiffs moved to have the matter maintained as a class action. *Chapman v. First National Bank of Highland Park* (No. 77–2023), commenced on January 26, 1977, was originally

brought as a class action. All decisions on class status were deferred until decision of the present appellees' motion to dismiss.

A third lawsuit raising similar claims against the appellees herein was decided below along with those before us. *Hemisphere Travel, Inc. et al. v. First National Bank of Highland Park et al.*, 440 F.Supp. 1257 (N.D.Ill.). Apparently there has been no appeal in that action.

concern. Since its enactment in 1958, the FFA was twice amended by provisions designed to afford greater·protection against financially irresponsible charter organizers who too often had left travelers stranded and helpless. In 1962, Congress added section 1371(n)(2), Pub.L. No. 87–528, which, in order to effectuate its announced aim of "protect[ing] travelers", directed the CAB to promulgate regulations requiring supplemental air carriers engaged in charter tours to make appropriate security arrangements for the purposes of providing adequate compensation should the tours not proceed as scheduled.[2] Pursuant to its statutory authority, the CAB did, in fact, carry out its duties by prescribing an extensive regulatory scheme for the conduct of the charter tour industry. See Special Charter Regulations, 14 C.F.R. Part 378 (1977). In order to better elucidate our reasons for concluding that plaintiffs are properly before the federal courts to enforce these regulations, we set forth a summary of the rules designed by the CAB to implement Congress' directive to assure proper financial management of charter tour monies, see House Committee Report, H.R. 1639, 1968 U.S. Code Cong. & Admin.News, pp. 3594, 3597; 30 Fed.Reg. 281, 282 (1965), the interpretation of which will be involved in the resolution of this dispute.

To qualify as a "tour operator" permitted to make charter arrangements, the CAB has required the fulfillment of certain filing prerequisites: One must file a prospectus, a surety bond, and a depository agreement executed by a federally insured bank. 14 C.F.R. §§ 378.10, 378.13 (1977). In this case, TTE "qualified" by filing the required prospectus and depository agreement between it and FNB as escrowee; TTE was permitted to file, and did file, a trust agreement, with FNB as trustee, in the amount of $200,000, in lieu of the surety bond.

The regulations also require a prescribed contract between the tour operator and the tour participants; this contract requires prepayment into an escrow account for transportation and ground accommodations, see 14 C.F.R. § 378.17. The tour operator must give notice to the participants of how to make checks payable to the depository bank and how to make claims against the surety should a tour be cancelled. See 14 C.F.R. §§ 378.16(b)(2)(iv), 378.17(b).

The depository agreement must conform with the regulations governing their form and content. Under the agreement, which creates a contractual ·relationship between the bank (here FNB), the tour operator (here TTE), and an air carrier, the bank is to establish and maintain separate accounts for each tour, see 14 C.F.R. §§ 378.-16(b)(2)(vii), 378a.31(b)(2)(vii), into which, presumably, the tour operator is to deposit prepayments. (The depository agreement between TTE and FNB is appended to Bratton's First Amended Complaint as Exhibit A.) Under the same regulations, a tour participant who deals with the tour operator is to make his payment directly to the bank's escrow account; on sales made by retail travel agents, the agent may deduct his commission from the prepayment offered by the customer, and then is to remit the balance to the designated depository bank. Pursuant to 14 C.F.R. §§ 378.18 and 378a.32, the bank is prohibited from "mak[ing] disbursements or payments from deposits except in accordance with the [other] provisions of this part". Thus, to greatly simplify matters, the bank may only pay the direct air carrier, hotels, sightseeing operators, and other surface accommodations up to a fixed percent of the total deposits received by the bank for the particular tour, and only at fixed times. See 14 C.F.R. §§ 378.16(b)(2), 378a.31(b)(2). Furthermore, the rules provide that, if the bank is notified of a tour cancellation, "the bank shall make applicable refunds directly to tour participants". 14 C.F.R. §§ 378.-16(b)(2)(iv), 378a.31(b)(2)(iv).

In the case at bar, FNB assumed the duties not only as escrowee, but also as

---

**2.** In 1968, section 1371(e)(6) was amended, Pub.L. No. 90–514, to permit regularly scheduled carriers to engage in charters provided they deal with wholesalers that meet CAB regulations.

trustee. (The Trust Agreement between FNB and TTE is appended to Bratton's First Amended Complaint as Exhibit B.) The trust, according to the bonding regulations, is to inure to the benefit of tour participants, and is to "continue in effect until completion of the tour". 14 C.F.R. §§ 378.16(b)(1), 378a.31(b)(1).

Against the backdrop of this rather complex regulatory scheme established "to protect travelers", 49 U.S.C. § 1371(n)(2), unfolds the story of the plaintiffs in this case. Although all of the Chapman and Bratton plaintiffs allegedly prepaid for the TTE-organized charter tours scheduled to depart after October 15, 1976, none was successful in obtaining a refund after the tours were cancelled. Shortly before the scheduled departure dates it became apparent to their creditors that TTE and its affiliated retail travel agencies were hopelessly insolvent, and, after an involuntary bankruptcy petition was filed, bankruptcy adjudications followed.[3] Plaintiffs allegedly requested that FNB return the prepayments which, plaintiff thought, would be available from the escrow accounts. FNB failed to refund any of the monies claimed by the plaintiffs; though over $740,000 was claimed by plaintiffs, the total in the escrow accounts for TTE tours is only about $391,000.[4]

These lawsuits ensued. In one cause of action, plaintiffs alleged that FNB and its officer, Shiffrin, violated the FAA and the Special Charter Regulations thereunder by having mismanaged the funds.[5] Specifically, plaintiffs allege that FNB acted out of self-interest to help TTE avoid its impending bankruptcy so that outstanding loans made by the bank to TTE would be repaid and so that the surety obligations would not be triggered. Further, plaintiffs aver that FNB made payments out of the escrow accounts pursuant to TTE's wrongful instructions, while fully cognizant that the regulations permitted only designated payments. The complaints also allege that the bank *qua* trustee violated its duties under the FAA. Finally, aside from the federal claims, plaintiffs also interposed pendent claims of fraud, breach of contract, and breach of fiduciary duty.

FNB and Shiffrin have denied, both on appeal and in their memoranda in support of their motions below, that any checks duly designated for the escrow accounts were diverted; further, they have taken the position that plaintiffs have no cause of action at all against them, asserting, in essence, that their duties ran only to TTE, with whom they contracted, and that under the agreement, plaintiffs who dealt only indirectly with them may not recover directly. Since discovery was stayed pending resolution of appellees' motion to dismiss, the circumstances of the disappearance of funds are not clear. It has not been determined which plaintiffs made checks payable to the bank, and which paid travel agencies. What is clear is that the bank has woefully insufficient funds in its accounts to refund monies to the many individuals, travel agents, associations, and social clubs who claim to have prepaid for cancelled TTE tours, and that serious allegations of wrongdoing have been made.

Under the circumstances, and for the reasons that follow, we reverse the order of the district court, and we hold that plain-

---

3. TTE and Sunshine Travel Agency, Inc., were adjudicated bankrupts on October 19, 1976. *In re Tour Travel Enterprises, Inc.*, No. 76 B 8014 (N.D.Ill.1976); *In re Sunshine Travel Agency, Inc.*, No. 76 B 8015 (N.D.Ill.1976). Sunshine Travel of Nevada, Inc., was adjudicated a bankrupt on October 26, 1976. *In re Sunshine Travel of Nevada, Inc.*, No. 76 B 8075 (N.D.Ill.1976).

4. Soon after TTE's bankruptcy, FNB filed an action in the nature of an interpleader in an attempt to foreclose the rights to the escrow account. The Bankruptcy Court ruled that the court lacked summary jurisdiction over the escrow funds. *In re Tour Travel Enterprises, Inc.*, No. 76 B 8014 (N.D.Ill. March 17, 1977).

5. Jurisdiction was alleged under 28 U.S.C. § 1331(a) (federal question), and 28 U.S.C. § 1337, which grants jurisdiction over cases arising under statutes enacted pursuant to Congress' authority to regulate commerce, regardless of the amount in controversy. We find jurisdiction proper under § 1337 since violations of the FAA are at issue.

tiffs have stated a claim for relief under the FAA.[6]

## II.

■ Although we believe that plaintiffs are properly before the court, we agree with the district court that no *explicit* cause of action was provided by Congress to remedy violations of the nature here alleged. Plaintiffs' argument was that section 1007(a) of the FAA, 49 U.S.C. § 1487(a) (hereinafter "section 1487(a)"), could be read to provide express authorization for a remedy in their case. That section provides for injunctive relief as follows:

"If any person violates any provision of this chapter, or any rule, regulation, requirement, or order thereunder, . . . the [CAB] . . ., or, in the case of a violation of section 1371(a) of this title, any party in interest, may apply to the district court . . . for the enforcement of such provision . . .; and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining such person . . . from further violation . . . and requiring their obedience . . . ."

Although plaintiffs argue that they are "parties in interest" and that their losses were caused by defendants' conduct which, allegedly, violates section 1371(a), we must disagree with their unduly strained reading of section 1487(a). Although there are many barriers to holding that an express cause of action exists under this section, the most compelling is that private persons are limited, under the section, to suits for violations of section 1371(a), which provides, in essence, that no "air carrier" may operate without CAB certification. Absent a violation of certification requirements by an "air carrier", no private enforcement is contemplated under this provision for injunctive relief.

■ The definition of "air carrier", it is true, includes one who undertakes "indirectly" to engage in air transportation, 49 U.S.C. § 1301(3), and has been deemed broad enough to encompass the activities of a tour operator who arranges charter flights. *See CAB v. Carefree Travel, Inc.*, 513 F.2d 375, 387–88 (2d Cir. 1975). However, we agree with the district court that, in this matter of statutory construction, even assuming that section 1487(a) could otherwise be deemed satisfied, a depository bank cannot be included in the definition of "air carrier".

■ Nonetheless, we think that plaintiffs may enforce compliance by implication under 49 U.S.C § 1371(n)(2) [FAA § 401(n)], which provides:

"In order to protect travelers and shippers by aircraft operated by supplemental air carriers, the Board may require any supplemental air carrier to file a performance bond or equivalent security arrangement, in such amount and upon such terms as the Board shall prescribe, to be conditioned upon such supplemental air carrier's making appropriate compensation to such travelers . . ., as prescribed by the Board, for failure on the part of such carrier to perform air transportation services in accordance with agreements therefor."

In reaching our conclusion that this quoted section provides a ground for private enforcement of the Special Charter Regulations, we have considered the four factors enunciated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which we now discuss.

■ The first *Cort* "test" is whether plaintiffs belong to the class for whose "especial benefit" the statute in question was enacted. In our view, there is little doubt as to this factor. The statute itself was enacted "to protect travelers". Further, it was designed to protect against a specific

---

**6.** Appellees' motion to dismiss was also predicated on the absence of an allegedly indispensable party (the trustee in bankruptcy). Appellees also claimed that these federal acts must be stayed under Fed.R. Bank. 401, 601. With the dismissal of the federal claims, the pendent claims were dismissed for lack of subject matter jurisdiction. Since we hold that the complaint should be restored, so, too, should the pendent claims.

wrong—the inability to obtain compensation when tour plans collapse. To meet the stated objective, Congress saw fit to empower the CAB to require supplemental air carriers (and "indirect" supplemental carriers) to provide adequate security arrangements so that travelers would receive their just compensation should a financially irresponsible carrier fail to perform agreed upon services. We think it safe to say that the plaintiffs are clearly within the protected class that section 1371(n)(2) was specifically designed to deal with.[7] Insofar as the plaintiff travel agencies are not, as the district court stated, "members of the traveling public", their status as proper plaintiffs derives from their having made good their customers' losses. Hence, those agencies which have done so should be permitted to take over the claims of their customers as subrogees.

Despite Congress' clear intention to provide protection to plaintiffs in this case, appellees argue that, regardless of whether or not plaintiffs are members of a protected class under the statute, the provision only relates to "supplemental air carriers", and since none of the appellees has such status (even if other defendants fit the definition), this suit is improper. We are not dealing here, however, with a question of construction of expressly granted remedial provisions, as above, but are rather attempting to discern the parties bound by the statutorily authorized regulations at issue. It is clear from a reading of both the statute and the Special Charter Regulations that the use of a depository bank, such as FNB, was a contemplated and necessary element in effectuating the stated purpose of providing for proper security under strict controls.

If implication of a cause of action is otherwise appropriate, FNB cannot escape its federally enforceable duties on the ground that it was not specially mentioned in the statute which enabled the CAB to regulate as it did. Because Congress envisioned that plaintiffs were to be protected from air travel abuses by means of the bank's adherence to federal requirements, we think that *Cort*'s first test is met.

The second factor in *Cort* is whether there is any indication of legislative intent, explicit or implicit, either to create a private remedy or to deny one. Not surprisingly, neither section 1371(n)(2) nor its legislative history reveals congressional intent. On this basis, appellees argued below, and the district court agreed, that since section 1487(a) of the FAA explicitly provides for agency (CAB) enforcement of all provisions of the FAA, and since it also provides for limited private enforcement of one provision of the Act (*i. e.*, enforcement of § 1371(a) by "parties in interest"), an inference arises that those expressly created remedies exclude all others, especially since no clear contrary evidence of legislative intent can be shown. This line of reasoning reflects the familiar maxim of *expressio unius est exclusio alterius*, which has recently been applied by the Supreme Court in *National Railroad Passenger Corp. v. National Association of Railroad Passengers (Amtrak)*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), and *SIPC v. Barbour*, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). Though the argument has some force in relation to this case, we do not believe it determinative. While we are aware that the doctrine was applied by the

---

7. The Special Charter regulations of the CAB make clear the extent to which plaintiffs are members of this new federally protected class. Those regulations were proposed "to insure the financial responsibility of the tour operator to the traveling public", Notice of Proposed Rule Making, 30 Fed.Reg. 281, 282 (1965), and "to provide better protection to the public from defalcations by tour operators or breach of the contract between the tour operator and the tour participant". Modification of Surety Bond Requirements for Tour Operators, 36 Fed.Reg. 6586 (1971).

Given the regulatory scheme, under which supposedly responsible institutions such as FNB were invited to agree to safeguard any funds that may be owing upon a tour operator's inability to perform, it becomes clear that plaintiffs' travails with the bank are exactly those as to which the federal scheme was to afford protection. *See also* H.R.Rep. No. 1950, 87th Cong., 2d Sess. (1962), *reprinted in* 1962 U.S.Code Cong. & Admin.News, pp. 1844, 1866–67.

Supreme Court to deny the implication of a remedy in the cases it decided, we are mindful, too, of the Court's admonition that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose". *J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). We do not believe that the intervening cases since *Borak* in any way detract from the validity of that admonition; indeed, as recently as *Cort*, 422 U.S. at 84, 95 S.Ct. 2080, we were reminded that effectuation of the congressional purpose is paramount. In this case, we think that Congress' recent concern with the plight of uncompensated travelers, which resulted in two enactments that postdated the enactment of section 1487(a), the general remedial provision, indicates that if Congress did not expressly consider the issue of private enforcement of the Charter Regulations, nor did it intend to deny a remedy. The application of *expressio unius* in this context would serve only to frustrate the goal of assuring adequate security for travelers' compensation.

■ In any case such as this, where there is no indication of congressional intent to create or deny a private remedy, and where there *is*, under the statute in question, provision for agency enforcement, the extent of the agency's enforcement powers must be carefully considered before deciding whether *expressio unius* is to apply, and whether the implication of a private remedy would be "consistent" with the underlying purposes of the statute in dispute, which is the third *Cort* factor to be considered. The two "tests"—the second and third *Cort* factors—interrelate in a case such as this. We think that the district

judge relied unduly on the theoretical availability of CAB enforcement powers when he determined that the availability of such powers militated against plaintiffs' position. We are dealing here with the enforcement of only one small part of the FAA which, though small, has spawned a vast regulatory scheme, the single goal of which is to assure relief to a traveler whose travel plans are thwarted.

■ Although the CAB may enforce the regulations by suing to enjoin violations, the agency has admitted that it cannot singlehandedly police the administration of the Special Charter Regulations to prevent violations from occurring.[8] We recognize, as did the district court, that practical limitations on agency capabilities do not alone lead to the conclusion that any interested party should have a private remedy to enforce those matters within the agency's purview. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). However, in a case such as this, where practical limitations are combined with a clear possibility that agency action may never be adequate to remedy the precise wrong which Congress sought to prevent, we think that a federal court must be willing to permit private remedial measures to better effectuate compliance with federal goals. The district court realized, in the case at bar, that CAB action would undoubtedly come too late to *prevent* travelers from sustaining losses due to violation of the Charter Regulations; however, Judge Grady relied on the supposed fact that, even if loss may not be prevented, once it is suffered, the CAB, though lacking the power to itself order refunds, may sue

8. The CAB commenced its own action under section 1487(a) of the FAA in November 1976, against Mann, Tauber, FNB and Shiffrin. *CAB v. TTE*, 440 F.Supp. 1265 (N.D.Ill.1977) (No. 76 C 4693). The CAB alleged that these defendants violated the regulations, and the complaint asked that they be restrained. The court was also asked to appoint a trustee to act on behalf of the tour participants to prosecute claims and to collect and distribute any monies due to TTE's prospective travelers.

In a Memorandum of Law addressed to the court, the CAB confessed that the finding and

proving of violations of its regulations on the basis of the voluminous charter filings it received would require full-scale investigation and numerous field audits—an operation it was ill-equipped to handle. Even if it were to discover violations, "[i]t is axiomatic that such efforts are frequently, as here, too late for a simple injunction to foreclose harm; they [investigations and audits] are expensive; and they are also necessarily selective". *Bratton* and *Chapman* Joint Appendix at 50, Memorandum of CAB.

to obtain an order for the refund of tour deposits by means of the appointment of a trustee. The one case cited for this proposition was the district court decision in *CAB v. Scottish-American Association, Inc.*, 411 F.Supp. 883, 888 (E.D.N.Y.1976). With all due respect, we think that some question may still exist as to the CAB's authority under section 1487(a) to obtain refunds for travelers. Though the *Scottish-American* decision, resting on equitable principles, has force, there is authority, perhaps overlooked below, to the contrary. *See Fitzgerald v. Pan American World Airways*, 229 F.2d 499, 502 (2d Cir. 1956); *Wills v. Trans World Airlines, Inc.*, 200 F.Supp. 360, 364 (S.D.Cal. 1961). We believe that an issue may still exist as to the scope of the CAB's enforcement powers under the FAA in a context such as this. We do not, of course, decide the issue, but point it out merely to indicate our concern that private enforcement of the right to a refund is certainly consistent with the goal of the legislation—to protect travelers—and is, indeed, critical in a case where agency enforcement may be inadequate, if not tardy.

This is not a case where agency expertise is needed for the resolution of the dispute. Nor is this a case, like *Cort* itself, where the plaintiffs sought to enforce but a secondary "goal" of the statute in question, if a goal at all. (There, the primary goal was to insure against election abuse by curbing the undue influence that could be exerted by large corporate expenditures; plaintiffs sought a remedy to make the corporation "whole", which, as the Court noted, would not aid in the enforcement of the primary goal of the criminal statute there in issue.) Here, plaintiffs seek a remedy for the very wrong the statute was designed to prevent, by the very means contemplated to protect them.

Although this factor is not controlling, we would note that other courts have not hesitated to imply private remedies under the FAA when deemed necessary to effectuate its purpose.[9] Under the circumstances at bar, we believe a private remedy is also necessary. Defendant-appellees in this case have, in essence, denied all liability to many of the plaintiffs (*i. e.*, those who did not directly make checks payable to the bank, but who dealt through travel agencies). They have set up "defenses", by way of appellate argument, which suggest that some conflict in the regulations will have to be reconciled, and the bank's duties to the travelers explicated. The very fact that the regulations will require interpretation is a factor which militates in favor of upholding plaintiffs' right to sue in federal court—and is the fourth *Cort* factor to be considered.

■ This final factor requires a determination of whether the matter before the court is one traditionally relegated to state law so that it would constitute inappropriate interference to imply federal power in the area. The district court was satisfied that plaintiffs had available to them state remedies since they had interposed claims sounding in fraud, breach of contract, con-

---

**9.** Private rights of action have been implied under the FAA in a variety of contexts. *See, e. g., Nader v. Allegheny Airlines, Inc.*, 167 U.S. App. D.C. 350, 512 F.2d 527 (1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) ("bumping" of passenger; action available under FAA § 404(b), 49 U.S.C. § 1374(b)); *Fitzgerald v. Pan American World Airways*, 229 F.2d 499 (2d Cir. 1956) (refusal to transport because of race); *Aircraft Owners & Pilots Ass'n v. Port Authority of New York*, 305 F.Supp. 93, 103–04 (E.D.N.Y.1969) (section 308(a), 49 U.S.C. § 1349(a), provides action insofar as it assures equal access to airports); *Mortimer v. Delta Airlines*, 302 F.Supp. 276 (N.D.Ill.1969) ("bumping"); *Town of East Haven v. Eastern Airlines, Inc.*, 282 F.Supp. 507 (D.Conn.1968) (action available to enforce operating and landing regulations to prevent undue noise pollution).

We are aware, of course, that private rights of action have been denied under other sections of the FAA, in other contexts. However, we do not believe, as appellees suggest, that implied actions must be limited to two areas of supposed "compelling national interest", *i. e.*, discrimination or "bumping" cases, and cases involving safety regulations. Rather, it is the court's function to imply a remedy under any Act of Congress when one is necessary to effectuate the purposes of the Act in question. Each case must be decided on its own merits. We think that a remedy is entirely appropriate in this case.

version, and breach of fiduciary duty. We do not agree, however, that the availability of these state causes of action should, or can, preclude a federal remedy under the circumstances.

At issue here is the bank's alleged willful violation of fiduciary obligations specifically imposed by its voluntary agreement to adhere to federal regulations. State courts attempting to define the duties arising in this case will necessarily have to refer to the federal regulations subsumed in the agreements between the principals. It would be highly undesirable and inappropriate for the federal court to permit inconsistent interpretations of the provisions by relegating plaintiffs to the courts of the various states, the rules of which, perhaps, could even be applied to defeat congressional goals. We believe that uniformity is required in this area which, as can be seen from the brief description of the regulatory scheme given above, is quite complex. If the duty of the depository bank is governed —indeed, created—by federal law, then the interpretation of the law creating the duty should surely be undertaken by the federal courts. FNB's "defenses", which perhaps would be availing absent the federal regulations by which it agreed to be bound, must be determined in accordance with those regulations, not state law. Thus, this factor in the *Cort* test also militates in favor of providing a federal forum.

In sum, we believe that plaintiffs have satisfied *Cort*'s "tests" for determining whether a federally implied remedy is appropriate. Though, as the district court noted, *Cort*'s tests were applied in that case to deny a private remedy, the factors to be considered require a qualitative analysis. Here, plaintiffs are unquestionably members of a class sought to be protected by congressional enactment, and the wrong which they suffered was the specific concern of the statute and the regulations thereunder. Where, as here, the federal right is so clearly defined, and where resolution of the dispute will depend on interpretation of the regulations in question, we will not deny a remedy.

We reverse the order dismissing the complaint. Since the federal claims are restored, the district court should also consider the pendent claims as well.

Reversed and remanded for further proceedings.

BAUER, Circuit Judge, dissenting.

I must respectfully dissent. It seems to me that the opening of new vistas in private causes of action ought to be approached rather fearfully and with a more tender regard for the acts of Congress and the limitations of the federal bench. The four-factor test of *Cort v. Ash* has been rather "adjusted" to reach the conclusions the majority pronounces. The trial court concluded that the plaintiffs have failed to meet the second, third and fourth tests of *Cort*—and with that opinion I agree.

To begin with, on the question of Congressional intent, I am not at all persuaded by the majority's efforts to brush aside the "*expressio unius*" doctrine that has figured so prominently in the Supreme Court's most recent efforts to determine whether an implied right of action exists under federal statutes. In *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, the Court declared that

> "when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies. . .
> This principle of statutory construction reflects an ancient maxim—*expressio unius est exclusio alterius*. Since the Act creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act."

414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Similarly, in the case at hand, Congress has provided a private remedy for violation of section 1371(a) of the FAA, but has not done so for section 1371(n). It seems quite apparent, there-

fore, that in this case, too, the principle of *expressio unius* "compels the conclusion that the remedies created in [§ 1371(n)] are the exclusive means to enforce the duties and obligations imposed by the Act."

While finding the argument to be of "some force," the majority nevertheless insists that *expressio unius* does not apply, apparently because a private right of action is "consistent" with the underlying purposes of the statute. In this manner, the majority incorporates elements of the third *Cort* "test" into the second, reasoning that "the two 'tests' . . . interrelate in a case such as this." Such an approach, however, misconceives the essential nature of the inquiry in deciding whether or not the *expressio unius* doctrine applies; for, as the Supreme Court has made clear,

> "[an] express statutory provision for one form of proceeding ordinarily implies that no other means of enforcement was intended by the Legislature. That implication would yield, however to '*clear contrary evidence of legislative intent*,' for which we [turn] to the legislative history and the overall structure of the . . . Act."

*Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1974) (emphasis supplied) (citations omitted). Thus, in determining the applicability of the *expressio unius* doctrine, the central question is not whether a private right of action is "consistent" with the purposes or goals of the statute, but rather, whether the overall structure of the Act, or its legislative history, furnish "*clear evidence*" of a Congressional intent to create a private remedy. This distinction is crucial, for, as the majority itself apparently concludes, "there is no indication" of such an intent in either the legislative history or the structure of the FAA. It follows from the majority's own conclusion, therefore, that *expressio unius* should apply and that the second of the four *Cort* tests is not met in this case.

Moreover, I cannot agree that a private right of action is even "consistent" with the structure and goals of the FAA. On this point, the majority appears to suggest that private remedial measures are necessary to further the Congressional purpose of protecting travelers from "losses due to violations of the Charter Regulations." But even if a major purpose of the Act is to protect travelers from such losses (and even if the majority is correct in claiming that the CAB *may* not be able to sue for a refund of tour deposits), it does not follow that a private remedy is consistent with the statutory scheme. In *Securities Investor Protection, supra*, the Court noted that

> "Congress' primary purpose in enacting the SIPA and creating the SIPC was, of course, the protection of investors. It does not follow, however, that an implied right of action by investors who deem themselves to be in need of the Act's protection, is either necessary to or indeed capable of furthering that purpose."

421 U.S. at 421, 95 S.Ct. at 1739. In this case, Congress has explicitly granted to the CAB the authority to enforce the statute and regulations at issue, and to seek an injunction against any further violations. 49 U.S.C. § 1487(a). Moreover, as was noted above, there is no extrinsic evidence that Congress contemplated the agency enforcement to be anything other than exclusive. I therefore find no basis for the majority's conclusion that a private right of action is "consistent" with the statutory scheme.

Finally, it seems to me that this cause of action is a matter "traditionally relegated to state law," and thus fails to satisfy the fourth requirement of *Cort*. The majority reaches the opposite conclusion on the grounds, apparently, that there is a need for "uniformity" in construing federal regulations. What the opinion fails to make clear, however, is precisely why an adjudication of the plaintiffs' common law claims of fraud, breach of contract, conversion, and breach of fiduciary duty, would "necessarily have to refer to the federal regulations subsumed in the agreements between the principals." To say that federal regulations required the bank to assume certain legal obligations to the tour operator (and hence the tour participants) is one thing. To say that the regulations defined those

obligations is quite another. And for my part, I can see no reason why a determination of the plaintiffs' non-federal claims would require anything other than the application of familiar principles of common law contracts and torts. I must conclude, therefore, that the fourth element of the *Cort* test, like the second and third, furnishes no support for the plaintiffs' position.

Regulatory agencies, and the rules they function under should not, it seems to me, be the launching pads for new judicial journeys that add more ballast to an already overburdened federal system of dispensing justice.

I would affirm the trial court's decision that found no private cause of action exists under the regulations in question.