CIVIL AERONAUTICS BOARD,
Plaintiff,

and

Earl Bratton, et al., Intervening
Plaintiffs-Appellants,

v.

TOUR TRAVEL ENTERPRISES, INC.,
et al., Defendants-Appellees.

CIVIL AERONAUTICS BOARD,
Plaintiff-Appellee,

and

Earl Bratton, et al., Intervening
Plaintiffs-Appellees,

v.

Nathan YORKE, Trustee of Tour Travel
Enterprises, Inc., Sunshine Travel Agency, Inc., and Sunshine Travel of Nevada,
Defendant-Appellant.

Nos. 78–1577, 78–1625.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1979.

Decided Sept. 10, 1979.

As Amended Nov. 20, 1979.

---

Kenneth F. Levin, Beatty, Levin, Holland, Basofin & Sarcany, Jed R. Mandel, Jenner & Block, Thomas R. Meites, Chicago, Ill., for intervening plaintiffs-appellants.

James F. Bishop, Crystal Lake, Ill., Christopher A. Bloom, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This interlocutory appeal challenges the district court's order establishing priorities to be followed in disbursing funds from an escrow account. The account was established to protect travel tour participants, whose deposits reserved places on tours which, because of the bankruptcy of the tour operator, never occurred. For reasons as yet undetermined, the account holds less than the required amount. The district court ordered that those deposits directly traceable into the account be refunded to their depositors. The court's action is challenged on several grounds, but we reach only one. We hold that absent claimants should have been notified and given an opportunity to be heard before priorities were established, and therefore we vacate the district court's order and remand for further proceedings.

## I.

The appeal stems from one of the several suits arising from the financial collapse of Richard Tauber's and Gerald Mann's travel tour conglomerate.[1] The Civil Aeronautics Board initiated the action, charging violations of the Federal Aviation Act, 49 U.S.C. § 1485(e), and its charter regulations, 14

---

1. Parallel litigation before the district court that was initiated by private parties is detailed in this court's opinion in *Bratton v. Shiffrin*, 585 F.2d 223 (7th Cir. 1978), *vacated*, —— U.S. ——, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). The record also indicates that similar private actions are pending in the state courts.

C.F.R. §§ 378 and 378a (1978).[2] It sought the appointment of a trustee to represent all tour participants, an accounting of the funds in the escrow account, and an injunction prohibiting future violations of its regulations. Named as defendants were several corporations and individuals: Tour Travel Enterprises (TTE), Sunshine Travel Agency, Inc., Sunshine Travel of Nevada, Inc.,[3] Mann and Tauber, the First National Bank of Highland Park, and Joel Shiffrin, a vice president at the bank. The three corporations sold travel tours; Mann and Tauber in addition to being officers also owned all the stock in the three corporations. The First National Bank of Highland Park was escrowee and Shiffrin managed the escrow account. Although the CAB originally filed the action, four groups of disappointed tour participants or their travel agents intervened to participate in the proceedings before the district court: the Bratton Intervenors,[4] the Chapman Intervenors,[5] the Travel First of Crystal Lake Intervenors,[6] and Hemisphere Travel, Inc. and Victoria Travel, Ltd.[7]

TTE organized and marketed inclusive tours and one-stop-inclusive tours to a variety of domestic and foreign locations. Apparently, it sold tours to travelers both directly and through travel agencies. The commonly controlled corporations, Sunshine Travel Agency, Inc. and Sunshine Travel of Nevada, Inc., as well as other travel agencies unaffiliated with the Tauber-Mann conglomerate, were among the travel agencies dealing with TTE.[8]

**2.** The district court ruled that the CAB could maintain the action under 49 U.S.C. § 1487(a). *CAB v. Tour Travel Enterprises*, 440 F.Supp. 1265 (N.D.Ill.1977).

**3.** Because the three corporations were bankrupts and were protected by an automatic stay pursuant to Bankruptcy Rule 401, they were not served with process. The trial court however, ruled that the trustee in bankruptcy was not an indispensable party to the suit and permitted the action to proceed against the other defendants. 440 F.Supp. at 1267–68. The trustee in bankruptcy later voluntarily entered his appearance prior to the order challenged here.

**4.** The Bratton Intervenors are Earl Bratton, the Columbus Travel Agency, the National Association of College Auxiliary Services, the Carl Sandburg Village Tennis Club, the Chicago Society of Association Executives, and the Des Moines District Dental Society. They are also plaintiffs in the parallel private litigation. *See* note 1 *supra*.

**5.** The Chapman Intervenors are Roger and Jeanne Chapman. They purport to represent a class of disappointed tour participants who can trace their deposits into the escrow account. However, no class has been certified and no determination of their ability to represent such a class has been made by the district court either in this CAB enforcement action or the parallel private action. *See* 585 F.2d at 225 n. 1.

**6.** The Travel First Intervenors describe themselves in their brief as forty-eight travel agencies from the Midwest and Ontario who offered the TTE tours to their clients. (Their petition for intervention in the district court, however, lists only forty travel agencies.) The brief of these intervenors describes their interest in this litigation as follows:

> The retail travel agencies comprising the TRAVEL FIRST OF CRYSTAL LAKE, INC., Intervenors-Appellees, have pursued this litigation, in most instances, because as businessmen, they felt required to "refund" to the tour participant his payment which is now held in escrow. Thus, the retail travel agent has become the assignee of the tour participant. However, in a few instances, the retailer is representing the tour participant as "agent."

The nature of this "agency" is not explained. The Travel First Intervenors, like the Chapman Intervenors, claim to be able to trace the deposits they made into the escrow account.

**7.** The nature of the claim to the fund by these travel agents is unclear, and neither has participated in this appeal. Their motion to intervene claims a deposit of their funds into the escrow account, but unlike the Travel First Intervenors, these intervenors have made no claim either by way of assignment or "agency."

**8.** TTE thus operated as a "tour operator" marketing charter tours. The CAB has explained the central role of the tour operator in providing charter travel services as follows:

> The essence of the charter concept is a bilateral contract, and at the center of the contractual relationship is the tour operator. (The tour operator is bound by bilateral contracts with the direct air carrier, the charter participant and the financial institution securing the funds.) Unlike scheduled service, sold either directly by the route carrier or through a travel agent, the charter operator bears the risk of operating a financially suc-

Charter tours are planned many months in advance and tour operators like TTE typically require prepayment of the entire tour price. Needless to say, this leaves would-be tour participants open to the considerable risks of the tour operator's bankruptcy, fraud, or careless planning. *See generally* Dickerson, *Travel Consumer Fraud: Rip-Offs and Remedies,* 28 Syracuse L.Rev. 847 (1977). The CAB regulations sought to be enforced in this action, 14 C.F.R. §§ 378 and 378a (1978), were intended to reduce these risks.

The CAB regulations have already been described in this court's earlier decision in *Bratton v. Shiffrin,* 585 F.2d 223 (7th Cir. 1978), *vacated,* —— U.S. ——, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979), and have subsequently been revoked and replaced with new ones. *See* 43 Fed.Reg. 36,603–04 (Aug. 18, 1979, effective Jan. 1, 1979) (revoking 14 C.F.R. §§ 378 and 378a); Final Rule, Public Charters, *id.* at 36,604 (codified in 14 C.F.R. § 380 (1979) ); Final Rule, Consumer Protections for Charter Participants, 44 Fed. Reg. 12,971 (Mar. 9, 1979). It is fair to say that the regulations will undergo additional modifications in the near future. *See* 43 Fed.Reg. 36,604, 36,606 & n. 20 (Aug. 18, 1978)(tour operators' responsibility to provide surety bonds and escrow agreements is subject to a CAB proceeding in docket 31735); Final Rule, Public Charters, Extending Consumer Protection Requirements to Other Charter Types, 44 Fed.Reg. 43,464 (July 25, 1979); Notice of Proposed Rulemaking, Public Charters, Escrow Depository Requirements, 44 Fed.Reg. 32,399 (June 6, 1979). Consequently, there is little point in our describing the past regulatory scheme in great detail. Greatly simplified, the regulations required a tour operator to submit to the CAB a prospectus encompassing a myraid of details ranging from the type and capacity of the aircraft to advertising samples. If the prospectus passed the CAB's inspection, the tour operator could market the tour. Each tour included a standardized contract between the tour participant and the operator. The contract stressed the tour operator's responsibility for his own negligence or mismanagement and specified refund procedures: if the tour operator canceled the tour, the escrowee refunded the entire amount directly to tour participants.

Most importantly for the purposes of this appeal, the regulations required tour operators to make arrangements to secure their financial viability and to protect travelers against the loss of their advance payments. For a series of tours the tour operator furnished either a large surety bond or a smaller surety bond along with an escrow account for tour participants' deposits.[9] TTE, as do most tour operators, elected the second arrangement. It selected the defendant, First National Bank of Highland Park, which already maintained business accounts for TTE, Sunshine Travel Agency, and Sunshine Travel of Nevada, as the depository bank for the escrow account. The bank not only acted as escrowee, but also as trustee on a surety bond in the amount of $200,000.

cessful flight. His estimate of the potential of a particular market, and his willingness to risk his capital in charter contracts with direct air carriers, generally months before sale to the public, is the essential element in the charter industry today.

43 Fed.Reg. 36,604, 36,606 (Aug. 18, 1978). *See also* Dickerson, *Travel Consumer Fraud: Rip-Offs and Remedies,* 28 Syracuse L.Rev. 847, 848 n. 4 (1977):

A wholesaler is the middleman between the retail travel agent and suppliers such as hotels, steamship companies, airlines, touring buses, and car rental companies. The wholesaler selects specific travel components such as transportation, accommodations, and services, and creates a package tour, the components of which are delivered over an extended period of time. The most popular time frame is a week which is often referred to as eight days and seven nights. The tour package is described in a brochure which is distributed to retail travel agents who in turn display these brochures. The creation of brochures is itself a multimillion dollar business.

9. The function of the surety bond when the second alternative is chosen by the tour operator is examined in some detail in the CAB's Interpretation of Regulations Concerning Surety Bonds, 44 Fed.Reg. 44,149 (July 27, 1979).

The regulations also governed the bank's behavior. Only accounts at federally insured banks were allowed and a separate record for each tour was required to be maintained. The bank's authority to permit withdrawals was limited and the tour operator had none. Aside from refunds to tour participants, the only disbursements permitted were those to direct air carriers, hotels, and other supplying surface accommodations. These withdrawals, however, could not deplete the reserve below twenty percent of the total deposits received. The entry of funds was regulated less closely. The bank was required to maintain a separate accounting for each tour. The regulations also authorized two means by which deposits could enter the escrow account. If a tour participant dealt directly with a wholesaler like TTE, the regulations required that his check be made payable directly to the depository account. If, however, a tour participant dealt instead with a retail travel agency like some of the intervenors, the participant would pay the agent, who, presumably after deducting his commission, remitted the balance to the escrow account.

The problem here is that the day before TTE and the two controlled travel agencies were declared involuntary bankrupts the escrow account held $391,579.58 instead of the estimated $750,000 which tour participants had prepaid for TTE tours. Since this appeal was certified under 28 U.S.C. § 1292(b) before any meaningful discovery took place, one can only speculate about the disappearance of the funds. One explanation is that the missing money never reached the account. Travel agencies—especially those in dire financial straits—might have forwarded less than the required amount. Or alternatively, the bank might have mistakenly or otherwise placed deposits by TTE, Sunshine Travel Agency, or Sunshine Travel of Nevada into their business accounts instead of the escrow account. It is also possible that the money may have entered the account only to be withdrawn later. The bank, for example, might have guarded withdrawals less carefully than the regulations mandated. According to yet another theory, some of the money might not be the deposits of disappointed tour participants at all. Instead it might belong to TTE as profit from past completed tours.[10] In any event, there are only clues as to the money's disappearance and at this early stage of the litigation the district court was unconcerned with these questions.

On its own motion, the court suggested that the existing funds should be distributed and ruled that those able to trace their money into the account deserved first priority in the funds. After considering the pleadings, memoranda of law from both the original parties and the intervenors, the stipulation of facts, oral arguments by counsel, and the escrow agreement itself, the district court concluded that the funds were held for each individual depositor and that those who proved the fund actually held their money were entitled to the money's return. Anticipating that the money which could be traced into the account might amount to less than the entire fund, the court deferred ruling on who might claim any of the deposits which might remain. The court then stayed the implementation of its order until we acted upon this appeal.

## II.

The district court's order establishing priorities to the fund cleared the way for appellate review both by directing entry of a final judgment upon a determination that there was no just reason for delay pursuant

---

10. There has been some suggestion by some of the intervenors before this court that the trustee is foreclosed from asserting any right to these funds by the decision of the bankruptcy judge in *In re Tour Travel Enterprises, Inc.*, No. 76 B 8014 (N.D.Ill.1977). There the bankruptcy court held that it did not possess summary jurisdiction over the funds. We have examined that court's decision, however, and note that it expressly stated that its ruling was "without prejudice to the resolution of the proper disposition of the contested funds in a plenary proceeding."

to Fed.R.Civ.P. 54(b) and by certifying the matter as one involving a controlling issue of law pursuant to 28 U.S.C. § 1292(b). Although Rule 54(b) and section 1292(b) are generally considered mutually exclusive avenues to appellate review, 10 C. Wright & A. Miller, Federal Practice and Procedure § 2658 at 62 (1973), in actions in which it is unclear whether the rule or the statute governs alternative certification is permissible. *Id.*; 16 C. Wright, A. Miller, E. Cooper and E. Gressman, Federal Practice and Procedure § 3929 at 148 (1977). This court in an unpublished order granted the Bratton Intervenors' petition for permission to appeal pursuant to section 1292(b), *Bratton v. Tour Travel Enterprises*, Misc. No. 78–8034 (May 3, 1978), and upon further consideration we believe this appeal is properly before this court under that statute, rather than under the rule.

◼ Rule 54(b) is applicable in those actions in which the district court adjudicates a matter in a multi-claim or multi-party action that but for the multiple claims or parties would be immediately appealable under 28 U.S.C. § 1291. Therefore, the district court's decision must be of such a character as to the party or claim which it affects that it may be considered "final." We do not consider the district court's order to be of this character. The order does not direct the immediate distribution of the fund; it looks forward to a determination of which claimants are able to trace and which are not. It also leaves undetermined the amount of each traceable claim. Even as to those who cannot trace, the order does not completely foreclose any right to the fund. Instead, it apparently contemplates that these claimants may assert their claims against any balance in the fund after those able to trace have satisfied their claims. The order is more appropriately considered interlocutory and thus subject to the requirements of 28 U.S.C. § 1292(b). It is uncontested that the district court's order conformed to the requirements of that statute and the permission of this court to prosecute the appeal was timely requested.[11]

### III.

◼ As we read the district court's order, it certified two, not just one, controlling issues of law for our consideration.[12] The first question is whether the court should have established priorities for the immediate distribution of the fund. The second question, which arises only if the first is answered affirmatively, is whether the priority established is proper. We do not reach the second question because we hold that the establishment of priorities by the court given the present posture of the pro-

---

11. We do note, however, that, although this court's jurisdiction is proper under section 1292(b), the controversy has come before us in a procedurally unusual, if not irregular, manner. The CAB which initiated this action filed a notice of appeal, *CAB v. Tour Travel Enterprises*, No. 78–1644 (docketed May 19, 1978), but later, for reasons which are not apparent in the record and without objection by any of the other parties, it voluntarily dismissed the appeal. In an unpublished order dated October 12, 1978, this court permitted the appeal's dismissal and acknowledged the communication of the CAB's intention not to file a brief in No. 78–1625 or to participate in No. 78–1577. Since the district court's ruling, however, the CAB has issued new regulations, *see* page 1001, *supra,* the effects of which on the merits of this action and on the CAB's willingness to continue to prosecute it are unclear. Moreover, none of the defendants named in the CAB's complaint, except the trustee in bank-

ruptcy, have participated in the appeal, and the trustee, of course, represents the bankrupts' general creditors, not those accused of violating the CAB's regulations. Thus, the only parties participating in this appeal are those who happened to intervene or voluntarily consented to be made parties in the action. One gets the distinct feeling of being a passenger on a ship launched into the open sea without a rudder.

12. In any event, since under section 1292(b), it is the order from which an appeal may be prosecuted, not just the controlling issue of law certified by the district court, our jurisdiction extends to the first question even if our interpretation of the questions certified is incorrect. *See* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3929 at 144–45 (1977); Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv.L.Rev. 607, 628–29 (1975).

ceedings was premature. Nevertheless, some discussion of the contentions of the parties with regard to the second question is necessary to understand our holding.

Although the facts are not clear, it is uncontested that the escrow fund will prove insufficient to satisfy all the claims of would-be tour participants. It is also uncontested that less than all of the claimants were either joined as parties or given notice of the pendency of this action. After the trial court on its own motion ordered that priorities be devised to distribute the fund, the CAB, the defendants, and the intervenors proposed a variety of priority schemes. The bank proposed a scheme dividing claimants into three classes. The government identified nine separate categories of possible claimants, but proposed a "constructive trust" theory in which no priorities would be established and all claimants would recover *pro rata* in proportion to the amounts of their respective claims. This is essentially the same scheme advocated by the Bratton Intervenors before this court. The trial court, however, adopted the scheme advocated by the Chapman and First Travel Intervenors and apparently the bank. Under this scheme, those who could "trace" their monies into the escrow account would be entitled to priority. Both schemes have some merit. The tracing scheme seems to accord with principles governing special deposits. The *pro rata* scheme, however, seems to be more consistent with the design of the CAB regulations and their purpose to protect the traveling public. Since the escrow arrangement is merely an alternative to a full surety bond, treating the escrow account separately seems somewhat anomalous. Neither scheme urged upon this court is frivolous; indeed the trial court necessarily certified the question as one "to which there is a substantial ground for difference of opinion." 28 U.S.C. § 1292(b). Moreover, given the present posture of the proceedings, we cannot be sure that there are not other distribution schemes just as meritorious.

The portion of the lawsuit before us now requires that we pass on numerous conflicting claims to a limited fund. Yet apparently no effort has been made to join as parties all of the disappointed tour participants who paid for TTE tours. Their conflicting interests are purported to be represented by the various intervenors, but given the state of the record before us, we are unable to make any determination of the adequacy of that representation. *See* notes 4–7 *supra.* Although the Bratton and Chapman Intervenors are attempting to maintain class actions in the parallel private litigation, no class certifications have been made in those actions and certainly no such certification has been made in this one. To some extent the CAB represents the traveling public, but we do not believe that it can be seriously contended that it can adequately represent all the claimants when their claims are obviously antagonistic.

The question of which of the disappointed tour participants have rights in the escrow account is presented to us as a question of law in a suit devoid at this stage of factual findings and supported only by a stipulation of facts which some of the parties have refused to sign. Even if we regard the issue as presenting only a question of law, we are concerned lest our answer to it prejudice those not as yet made parties to this action. The trial court's order contemplates that notice will be given to claimants after this court passes on their rights to the fund. Presumably, those who decline to participate would not be bound by any judgment, but at the same time they would relinquish, as a practical matter, their claims against the escrow account. Conversely, those who, after receiving notice, do make claims against the fund would do so with the controlling issue of law already determined. Apparently, those unable to trace would then also be unable to contest the priority given to those able to trace. It seems extremely unlikely that the trial court (or this court for that matter) would reexamine the question once it is ruled on here. We think that fairness to absent claimants requires that they be given the opportunity to be heard on this question prior to our answer to it. *See Tankersley v.*

*Albright*, 514 F.2d 956, 965–68 (7th Cir. 1975); *cf. Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See also Porter v. Warner Holding Co.*, 328 U.S. 395, 403, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). This is particularly so where, as here, the ability of other parties to the action to adequately represent the interests of the absentees is uncertain.

We note also that considerations of fairness to the bank also argue in favor of deferring establishment of priorities until after all claimants are given an opportunity to be heard. The bank has not asserted any claim of its own to the escrow funds; it is no more than a stakeholder. If absentees are not bound by this court's ruling, the bank may be faced with multiple liability in subsequent actions if a later court disagrees with our determination of the rights in the fund. *Cf. Western Union Telegraph Co. v. Pennsylvania*, 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961). Although the bank did not raise this issue before the district court, the dilemma in which it finds itself is not entirely of its own making. It at least attempted to have the conflicting claims to the escrow account adjudicated in bankruptcy court by filing an action in the nature of interpleader. The bankruptcy court, however, dismissed the complaint for want of jurisdiction. Although we admit our puzzlement as to why the bank did not pursue other means for adjudicating these claims,[13] we do believe that its position is not totally devoid of equity and is deserving of some consideration by this court.

Were this matter one before us in the first instance, we would find that the absentee claimants were, if not necessarily indispensable, at least persons who should have been joined if feasible. *See* Fed.R. Civ.P. 19; *Tankersley v. Albright*, 514 F.2d 956, 965–68 (7th Cir. 1975). This issue was not raised until this appeal, however, and, although we recommend that the trial court consider the advisability and practicability of joinder of all claimants upon remand, we do not hold that the claimants necessarily must be joined. Instead, we hold that, under the circumstances of this case, where the interests of the claimants to a limited fund are conflicting, the trial court's equitable power to order an accounting and a refund as an adjunct to its power to grant an injunction in a government enforcement action, is conditioned upon first affording those claimants who can be ascertained with reasonable diligence notice in a manner reasonably calculated to apprise them of the action. *Cf.* 15 U.S.C. § 57b; *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Such notice should precede any rulings of substance as to their rights to the fund.

For the reasons given above, the order of the district court is vacated and the matter remanded for further proceedings consistent with this opinion. Our action should not be considered as precluding certification of the issue of priorities anew after notice and an opportunity to be heard have been afforded to those claimants who have not yet had an opportunity to participate in these proceedings.

---

**13.** Offhand it would seem to us that either Fed.R.Civ.P. 22 or more likely 28 U.S.C. § 1335 would have been available to the bank.