**ALOHA AIRLINES, INC., Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,
Respondent.**

**No. 76–2131.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 10, 1978.

Decided March 30, 1979.

---

11. Tr. II 25.

Raymond J. Rasenberger, Washington, D.C., for petitioner.

John T. Ezell, III, Atty., C. A. B., Washington, D.C., with whom James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Alan R. Demby, Atty., C. A. B., John H. Powers, III, and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Also Robert L. Toomey, Atty., C. A. B., Washington, D.C., entered an appearance for respondent. Also Carl D. Lawson, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by ROBB, Circuit Judge.

ROBB, Circuit Judge:

This case comes here on a petition by Aloha Airlines [1] to review an order of the

---

1. Pursuant to 49 U.S.C. § 1486(a).

Civil Aeronautics Board. In its order the Board found Aloha guilty of illegal rebating, unjust discrimination, and unfair practices and methods of competition in violation of the Federal Aviation Act of 1958, as amended, sections 403(b), 404(b) and 411, 49 U.S.C. §§ 1373(b), 1374(b) and 1381. We affirm the Board's decision in part.

The case began with a complaint filed by Hawaiian Airlines, the principal competitor of Aloha, on August 2, 1973. In substance the complaint attacked a so-called "fly-drive" arrangement between Aloha and Budget Rent-A-Car, a company engaged in the car rental business in the Hawaiian Islands. Specifically, it was alleged that in violation of section 403(b) of the Act Aloha offered to its round-trip passengers a discount of $7.00 on any car rented from Budget, and that because Aloha arranged this discount by paying $7.00 to Budget for each car thus rented the discount constituted an illegal refund. The complaint further alleged that by limiting the discount offer to round-trip passengers Aloha subjected one-way passengers to unjust and unreasonable discrimination in violation of section 404(b) of the Act. Finally, the complaint charged that these practices were unfair and engaged in for the purpose of diverting passengers from Hawaiian to Aloha and thereby causing financial injury to Hawaiian, in violation of section 411 of the Act.

On October 11, 1973 the Director of the Board's Bureau of Enforcement filed a Petition for Enforcement, based on Hawaiian's complaint. The petition was filed pursuant to the Board's Procedural Rule 206, 14 C.F.R. § 302.206 (1978),[2] and averred that the complaint gave reasonable grounds to believe that violations of the Act had occurred and formal investigation by the Board was in the public interest. Hearings on the petition took place before an Administrative Law Judge (ALJ) in May 1975. Aloha, Hawaiian, and the Bureau of Enforcement participated.

In his initial decision issued September 19, 1975 the ALJ found that Aloha and Budget entered into a "fly-drive" agreement on September 22, 1971. In substance the agreement provided that Budget would offer to rent automobiles to Aloha's round-trip passengers for $7.00 for one day's rental of a Vega, Toyota, or similar car. The rate for one-way passengers would be $10.50. Budget's normal rate was $14.00 a day, and without the payments from Aloha the discounts would have caused Budget to lose money. The agreement provided that for each car rented to a round-trip passenger Aloha would pay Budget $7.00, and for each rental to a one-way passenger $3.50. All passengers would pay Aloha its published tariff fare, but when a passenger thereafter rented a car from Budget the agreed portion of this fare—$7.00 or $3.50—would be transferred to Budget by Aloha.

The Budget-Aloha agreement specified that Aloha's payments to Budget constituted Aloha's "share of the advertising costs". While the agreement was in operation the payments were made through an advertising agency which sent Aloha invoices purporting to reflect charges for that "pro-rata share". In fact however information for the billings was furnished by Budget, and the payments were not related to advertising costs at all, but were based solely on the number of rental contracts between Budget and Aloha's passengers. Budget's advertising expenses between September 1971 and December 1973, the period covered by the agreement, amounted to less than $360,000 but Aloha's payments to Budget were more than $1,350,000. The ALJ found that the purpose of the devious billing arrangement was to create the false impression that Aloha's payments were for advertising expenses.

The record before the ALJ disclosed and he found that on December 28, 1973, in response to Hawaiian's complaint, the original fly-drive arrangement was superseded by a new agreement. This agreement provided that Aloha would not make payments to Budget based on the number of rental car contracts, but would assume full and direct responsibility for advertising the fly-

---

**2.** The regulation has not been changed since 1973.

drive program. Pursuant to the agreement Aloha paid "some $360,000" for advertising during the period January 1974–May 1975. This amounted to "virtually" the entire advertising costs of the program. Budget in turn continued to rent cars to Aloha passengers at discount rates varying from $9.95 a day in 1974 to $13.95 in 1975, for Mazda cars. In carrying out the agreement Aloha did not make payments to Budget on the basis of the number of cars rented.

The ALJ found that Aloha violated section 403(b) of the Act by rebating, through Budget, a portion of the air fare paid by Aloha passengers who rented cars at reduced rates. He reached this conclusion with respect to both the original 1971 agreement and the superseding arrangement of 1973. He also concluded that the discount practices under both arrangements constituted unjust discrimination between passengers who used the fly-drive package and those who did not in violation of section 404(b) of the Act. He recognized that the complaint alleged only discrimination between round-trip passengers and one-way passengers, whereas the evidence showed that discounts were extended to both. Nevertheless he reasoned that the allegation in the complaint fairly "raised the [broad] question of unequal treatment of Aloha passengers under the fly-drive arrangement." Finally, he held that Aloha's operations under both the 1971 and 1973 arrangements violated the provisions of section 411 of the Act, in that they constituted unfair or deceptive practices or unfair methods of competition.

Aloha petitioned the Civil Aeronautics Board for discretionary review of the initial decision. The Board granted review, sustained the decision, and adopted as its own the reasoning, findings, and conclusions of the ALJ. The Board also denied a motion by Aloha to reopen the record and remand the proceeding to consider "newly discovered evidence" which was alleged to show that Hawaiian had engaged in rental car arrangements similar to the Aloha fly-drive program.

In this court Aloha opens its attack on the Board's decision with the argument that "[t]he Board's conclusion that Aloha violated section 411 must be set aside because the required 'public interest' finding, which must be made before an unfair competitive practice proceeding can be instituted, was not made."

Section 411, 49 U.S.C. § 1381 provides in relevant part:

The Board may upon its own initiative or upon complaint by any air carrier, . . . if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier . . . has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation or the sale thereof.

It is established that a finding that an investigation would be in the public interest is jurisdictional; the Board may not act to vindicate private rights. *FTC v. Klesner*, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138 (1930); *American Airlines, Inc. v. North American Airlines, Inc.*, 351 U.S. 79, 76 S.Ct. 600, 100 L.Ed. 953 (1956).

In this case the petition for enforcement filed by the Director of the Board's Bureau of Enforcement stated:

In the opinion of the undersigned Director of the Bureau of Enforcement, there are reasonable grounds to believe that certain provisions of the Act and requirements thereunder have been violated by the above-named respondent as alleged in the complaint filed and verified in the above-captioned proceeding, and that formal investigation by the Board of the alleged violations is in the public interest.

(J.A. 44)

Aloha says the Director's finding was invalid because the authority to make such a finding had not been properly delegated by the Board. In any event, Aloha argues, the allegations of the complaint do not support a public interest finding.

The Board's rules 200–218, 14 C.F.R. §§ 302.200–302.218 (1978) set out the

Board's "special rules applicable to proceedings for enforcement of the economic regulatory provisions of the act, and rules, regulations, orders, limitations, conditions and requirements issued thereunder." (14 C.F.R. § 302.200 (1978)) Rule 201, 14 C.F.R. § 302.201 (1978) provides for the filing of "a formal complaint by a person other than an enforcement attorney (hereinafter called a third party)." Rule 203, 14 C.F.R. § 302.204 (1978) requires that a third-party complaint be served upon the Director of the Bureau of Enforcement. Rule 206, 14 C.F.R. § 302.206 (1978) states:

Whenever in the opinion of the Director of the Bureau of Enforcement there are reasonable grounds to believe that any provision of the act . . . has been or is being violated, that, in the case of third-party complaints, efforts to satisfy a complaint failed, and that investigation of any or all of the alleged violations is in the public interest, the Director of the Bureau of Enforcement may institute an economic enforcement proceeding by docketing a petition for enforcement.

The Director's petition for enforcement in the matter of the complaint by Hawaiian Airlines against Aloha was filed pursuant to Rule 206, 14 C.F.R. § 302.206 (1978).

■ Aloha refers us to 14 C.F.R. § 385.22 (1978) of the Board's regulations, whereby the Board delegates to the Director of the Bureau of Enforcement authority to perform certain functions of the Board. Counsel then points to the statement of organization and delegation of authority set out in 14 C.F.R. § 384.7 (1978) and directs our attention in particular to the statement that "[t]he various continuous delegations of authority from the Board to the different staff components which are adopted by rules, are described in detail in this Title 14 of the Code of Federal Regulations, Part 385 of this chapter." From this foundation Aloha concludes that because section 385.22 contains no delegation of power to make the public interest finding required by section 411 of the Act, the Director of the Bureau of Enforcement had no such power. We cannot agree with this conclusion, which Aloha rests on the premise that Part

385, 14 C.F.R. § 385 (1978), is "the *sole and exclusive* repository of all delegations made by the Board." [Emphasis in original] (Br. for Aloha at 21) We think it plain that all Board delegations are not, nor are they required to be set forth exclusively in Part 385. As we have seen, the Board's rules governing enforcement proceedings are set out in detail in section 302 and it is reasonable and convenient that the procedure for the institution of enforcement procedures be included in that section rather than in Part 385.

■ We also reject Aloha's contention that the allegations of the complaint furnish no basis for a finding that investigation would be in the public interest. We think it obvious that widespread and persistent violation of section 403 of the Act, as alleged in the complaint, would be contrary to the public interest; indeed Congress so declared by enacting section 403. Likewise the allegation that Aloha had violated section 404(b) of the Act by discriminating between round-trip and one-way passengers raised a question worthy of investigation in the public interest.

■ It must be remembered that this court does not sit to determine independently what is the public interest in matters of this sort, committed as they are to the judgment of the Board. "We decide only whether, in determining what is the public interest, the Board has stayed within its jurisdiction and applied criteria appropriate to that determination." *American Airlines, Inc. v. North American Airlines, Inc.*, 351 U.S. 79, 85, 76 S.Ct. 600, 605, 100 L.Ed. 953 (1956). *See REA Express v. CAB*, 507 F.2d 42, 45 (2d Cir. 1974). Here, the Director of the Bureau of Enforcement acted within his jurisdiction and applied appropriate criteria. Finally, we emphasize that the finding of the Director was not a holding on the merits, but only a finding that an investigation should be conducted to determine whether violations of the Act had been committed.

Aloha next argues that the Board's finding that it violated section 411 cannot stand because "there was no proof in the record

that the Budget-Aloha agreement reduced service or traffic, or deceived the consumer, or increased prices or otherwise injured competition." (Br. for Aloha at 28) Aloha says "[w]hile proof of actual injury to competition is not necessary, there must at least be proof that the condemned conduct has the capacity to cause substantial injury to substantial competition." (Br. for Aloha at 27) Aloha rests this argument on the authority of *FTC v. Raladam Co.*, 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931). In that case the Court construed the phrase "unfair methods of competition in commerce" in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45). The Court held that proof of such unfair methods of competition required "that there be present or potential substantial competition, which is shown by proof, or appears by necessary inference, to have been injured, or to be clearly threatened with injury, to a substantial extent, by the use of the unfair methods complained of." 283 U.S. at 651, 51 S.Ct. at 591.

The fatal weakness in the authority of *FTC v. Raladam Co.* is that the Supreme Court in more recent cases has taken a different view of the matter. Thus in *American Airlines, Inc. v. North American Airlines, Inc.*, 351 U.S. 79, 76 S.Ct. 600, 100 L.Ed. 953 (1956), the Court said:

> The Board found that respondent knowingly adopted a trade name that might well cause confusion. But it made no findings that the use of the name was intentionally deceptive or fraudulent or that the competitor, American Airlines, was injured thereby. Such findings are not required of the Trade Commission under § 5, and there is no reason to require them of the Civil Aeronautics Board under § 411.

*Id.* at 86, 76 S.Ct. at 605. And in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) the Court answered in the affirmative the question

> does § 5 empower the Commission to proscribe practices as unfair or deceptive in their effect upon consumers regardless

of their nature or quality as competitive practices or their effect on competition? *Id.* at 239, 92 S.Ct. at 903.

■ In any event, the Board expressly found that the fly-drive arrangement had a significant impact on competition by causing the diversion of thousands of passengers from Hawaiian to Aloha and a shift in revenues of over one million dollars. These findings were supported by substantial evidence. During the period when the fly-drive program was in effect there was a substantial increase in Aloha's share of the business, and an increase in Budget's rental business. The President of Budget, in a letter to an Aloha director, stated that the fly-drive program was directly responsible for Aloha's gains in traffic and revenue and that "if anyone has any doubt, all he would have to do would be to ask Hawaiian Airlines how it has been hurt by this program." (J.A. 107) Finally, Hawaiian introduced the results of interviews conducted by an independent research company which revealed that a significant percentage of the passengers who used Aloha were influenced by the fly-drive program.

Aloha argues that the Board erred by refusing to consider the competitive environment in which the alleged violation of section 411 took place. Specifically, Aloha complains that the ALJ excluded "exhibits and other evidence tending to show that the Budget-Aloha agreement was triggered by Hawaiian's antitrust violation, and in fact preserved and promoted competition." (Br. for Aloha at 30) Furthermore, says Aloha, the ALJ failed to give adequate consideration to the "extremely weak financial condition of Aloha viz-a-viz Hawaiian" and the similarity of Hawaiian's fly-drive programs to the Aloha-Budget arrangement. (Br. for Aloha at 31) Finally, Aloha contends the Board committed error by refusing to reopen the record to receive newly discovered evidence on these subjects. According to Aloha the evidence excluded by the ALJ and the Board might have demonstrated that there had been no violation of section 411 by Aloha "in light of the business environment and marketing context." (Br. for Aloha at 33)

258

The short answer to Aloha's argument is that Aloha could not justify a violation of section 411 by proof that its competitor also violated that section. As the Circuit Court of Appeals for the 7th Circuit put it with respect to violations of section 5 of the Federal Trade Act "It is . . . immaterial that competitors employ the same or similar methods. If such be the case, it would afford the basis for an argument that such competitors should be dealt with likewise, not that petitioners should escape." *International Art Co. v. FTC*, 109 F.2d 393, 397 (7th Cir. 1940), *cert. denied*, 310 U.S. 632, 60 S.Ct. 1078, 84 L.Ed. 1402 (1941). *See also, FTC v. Universal-Rundle Corp.*, 387 U.S. 244, 251, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967). Nor could Aloha's weak financial condition justify a violation of the Act.

We turn to the Board's determination that Aloha's payments to Budget constituted fare refunds prohibited by section 403(b) of the Act. Section 403(b) requires carriers to charge the fares specified in their currently effective tariffs and expressly prohibits the refund or remittance of any portion of those fares "by any device, directly or indirectly . . . ." The provisions of section 403(b) were derived from the anti-rebating provisions of section 6(7) of the Interstate Commerce Act, 49 U.S.C. § 6(7). The decisions interpreting that statute and the related provisions of the Elkins Act, 49 U.S.C. § 1, provide "the best guide lines available" for construing section 403(b). *Northeast Airlines, Inc. v. CAB*, 345 F.2d 662, 666 (1st Cir. 1965).

The cases interpreting the Interstate Commerce Act established that the prohibition on rebates extends to the furnishing of auxiliary services to shippers and passengers at below cost or subsidized rates. *Baltimore & O.R.R. v. United States*, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318 (1939). *See also Union Pacific R.R. v. United States*, 313 U.S. 450, 61 S.Ct. 1064, 85 L.Ed. 1453 (1941). The Board determined that the Aloha-Budget arrangement of 1971 was a plain case of rebating through subsidization of another service. As the ALJ and the Board found:

In essence, an Aloha passenger paid Aloha its published tariff fare. Aloha, in effect, transferred a portion of the fare to Budget . . . .. Budget then rented a car to the passenger, receiving its normal rate (or a sum approaching it), with one portion of the fee contributed by the passenger and another by Aloha from the air fare. Thus, while the passenger initially paid the published air fare, he later received a refund of [a portion] of that fare in the form of the reduced rental car fee.

(J.A. 511) We think the ALJ and the Board were right.

The record demonstrates that Aloha's payments pursuant to the 1971 arrangement subsidized Budget's discount rates and amounted to fare rebates for the passengers renting Budget cars. Thus the record establishes the following facts:

1. During the two years the 1971 fly-drive program was in effect, Aloha paid Budget over $1,350,000. The payments to Budget were not computed on the basis of joint advertising and promotion expenditures but rather were a predetermined assessment for each car rented during the program.

2. The Aloha payments "bore a clear and identifiable relationship to the discounts" Budget offered to fly-drive passengers. (J.A. 513) Thus, Budget's standard compact car rental rate was $14, the Aloha payment for round-trip passengers was $7.00, and the Budget rental rate was correspondingly reduced to $7.00. Similarly, Aloha's $3.50 payment for one-way passengers was reflected in a corresponding rental car rate reduction from $14.00 to $10.50.

3. The President of Budget candidly testified that, absent payments from Aloha, the discounts could not have been made without losing money, and that he would not have entered into the arrangement but for the payments.

4. Neither Hertz nor any other rental car companies in Hawaii could match Budget's discount rate without losing money.

Hawaiian persuaded Hertz to try to match Budget's discount rate without subsidization, but Hertz was forced to abandon the program after three weeks because it was losing too much money.

5. Aloha undertook elaborate steps to mislead the Board as to the nature of its payments to Budget, including turning over a false copy of the fly-drive agreement to Board auditors, disguising payments to Budget through billings from an advertising firm, and reporting the payments to the Board as advertising and publicity expenses.

Aloha argues that its payments to Budget were a legitimate sharing of joint costs incurred in participating in the fly-drive program. We think the Board properly rejected this argument. In the first place Aloha's payments to Budget bore no relationship to advertising and promotion costs, but were based on the number of cars rented by Budget at discount rates. During the two years when the 1971 agreement was in effect Budget's advertising expenses, incurred through an advertising agency, amounted to less than $360,000, but Aloha's payments were more than $1,350,000. Although Aloha represents that its payments were justified as an offset to other expenses of Budget, such as "increased operating expenses", "higher maintenance costs", "increased depreciation" and other costs incidental to the program, the amount of these alleged expenses was never quantified, and there was no showing that they even remotely approached Aloha's $1,350,-000 payment. In any event Aloha cannot justify its payments as an offset to Budget's increased operating expenses and lower yields incurred in offering rental cars at discount rates. Aloha's payments constituted a rebate precisely because they contributed to Budget's operating costs and thereby enabled Budget to offer rental cars to Aloha passengers at below-cost rates.

 Aloha argues that its payments to Budget do not differ from other types of carrier promotional devices such as the provision of meals and drinks, in-flight movies and the use of credit cards by purchasers of air transportation. Aloha says the Board erred by failing to distinguish the fly-drive program from these other arrangements.

Before the Board Aloha did not raise the point that its program was comparable to other promotional devices which have been approved by the Board. Accordingly the issue is not open for consideration now. *See* section 1006(a) of the Act, 49 U.S.C. § 1486 and *Seaboard & Western Airlines v. CAB*, 87 U.S.App.D.C. 78, 183 F.2d 975 (1950); *Frontier Airlines v. CAB*, 142 U.S. App.D.C. 124, 439 F.2d 634 (1971); *Air Line Pilots Ass'n v. CAB*, 163 U.S.App.D.C. 451, 455, 502 F.2d 453, 457 (1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). Nevertheless we consider the point and reject Aloha's argument. All the arrangements cited by Aloha related to services supplied by airlines in connection with air transportation alone. The cost of meals served during flights is reflected in the fares paid by all passengers. Similarly, beverages and movies are paid for by those passengers who enjoy them. Credit card passengers pay the same fare as other passengers; no portion of the fare is remitted directly or indirectly to the credit card passenger. An airline does not violate section 403(b) by providing services connected with air transportation so long as an appropriate tariff has been filed under section 403(a) and the services are supplied in compliance with the filed tariffs. *See Passenger Credit Plans Investigation*, 37 C.A.B. 404, 406–07, 412 (1963); *Ground Transportation Between Airports*, 31 C.A.B. 5 (1960). *Cf. Baltimore & O.R.R. v. United States, supra*, 305 U.S. at 523–26, 59 S.Ct. 284.

 Although the decision of the Board that the 1971 agreement violated section 403(b) of the Act must be sustained we think the Board has not met its burden of establishing by substantial evidence that the 1973 agreement was likewise unlawful. As we have said, the complaint by Hawaiian Airlines, attacking the 1971 fly-drive agreement, was filed August 2, 1973. Based on this complaint the Director of the Board's Bureau of Enforcement filed his Petition for Enforcement on August 11,

1973. The 1971 fly-drive agreement was superseded by a new agreement on December 28, 1973. Hearings on the petition for enforcement took place before the ALJ in May 1975. The complaint was never amended to include a challenge to the legality of the 1973 agreement. Accordingly Aloha objected to the introduction of evidence on this subject upon the ground that it "did not come to the hearing prepared to defend itself on the post–1973 programs." The Board held however that Aloha suffered no prejudice because the facts concerning the 1973 arrangement were fully explored at the hearing and the evidence on the subject was undisputed. The second agreement, says the Board, was merely a variation of the first. Our view of the merits makes it unnecessary to resolve this procedural dispute.

In his decision the ALJ disposed of the 1973 agreement in summary fashion. He wrote:

> It is concluded that Aloha, under the December 1973 arrangement, has continued to violate the provisions of sections 403(b) and 411 of the Act. In effect, Aloha has continued to make possible reduced car rentals to its passengers by contributing substantially to Budget's costs. The only real distinction between the former arrangement and the present one is that, while in the former the rebate was tied directly to the number of the rental contracts, under the present arrangement the rebate takes the form of an aggregate payment to Budget through the absorption of all advertising costs and that rebate is *pro rated* to each of Aloha's passengers taking advantage of the lower car rental rate.

(J.A. 530)

The Board sustained the decision of the ALJ in all respects, without considering the details of the 1973 arrangement; indeed, the only discussion of specifics in the Board's decision related to the 1971 agreement. Likewise, in their brief in this court counsel for the Board do not analyze the second agreement in detail, but argue only that "the form of the payments to Budget was altered; everything else remained the same." (Br. for CAB at 49)

Analysis of the entire record convinces us that the Board has failed to deal adequately with critical differences between the 1971 arrangement and the 1973 program. Moreover the Board has failed to reconcile its disapproval of the 1973 program with its approval of a similar arrangement between Hawaiian Airlines and the Hertz Corporation.

In his decision the ALJ found that "the new agreement was entered into in response to the allegations that the prior arrangement was illegal, and was patterned after an agreement between Hawaiian and the Hertz Corporation." (J.A. 479–80) The record before us discloses that in September 1972 Hawaiian and Hertz made an agreement for the "joint promotion" of a car rental offer by Hertz to Hawaiian Airlines passengers. The agreement provided that "Hawaiian Airlines will purchase on a cooperative basis with Hertz advertising featuring the Hertz/H.A.L. $5 a day plus 11¢ per mile Fly/Drive plan. . . ." Hertz agreed to pay $32,000 toward purchase of the advertising, which was to be in an amount of not less than $90,000. Hertz agreed to offer "special rates to H.A.L. passengers for our B and C class cars." Both parties agreed that "[t]o qualify for these special rates the customer must have an adult round trip ticket to Oahu, Maui, Kauai or Hawaii, naming H.A.L. as designated inter island air carrier and a Hertz reservation through H.A.L. or Hertz local reservation office." (J.A. 607–09)

Aloha filed a complaint with the Board calling in question the legality of the Hawaiian-Hertz agreement. As counsel for the Board tell us in their brief the Board held that the arrangement was legal because "Hawaiian did not make any payments to car rental companies computed on the basis of the number of passengers who utilized the car rental agreement . . . Hawaiian did not pay any portion of the air fares it collected to a rental car company, and thus no refund or rebate was paid to any passenger or any other person." (Br. for CAB at 43–44)

Under the 1973 Aloha-Budget agreement, as in the Hawaiian-Hertz case, Aloha made no payments to Budget on the basis of the number of cars rented to Aloha passengers, nor did Aloha pay any part of the air fares it collected to Budget. The Board attempted to distinguish the Hawaiian case however upon the ground that by absorbing the advertising costs for the fly-drive program Aloha made possible Budget's reduced rental charges. This contribution to Budget's costs, said the Board, was *"pro rated* to each of Aloha's passengers taking advantage of the lower car rental rate." We are not persuaded by the alleged distinction. No attempt was made to equate the amount of Aloha's payments for advertising with the total amount of discounts allowed by Budget. The statement that Aloha's contribution "was *pro rated* to each of Aloha's passengers" renting a car was an unverified conclusion. Nor was there any showing that, absent the payment of advertising costs by Aloha, Budget would have been unable profitably to rent, and would not have rented, cars at the reduced rates— from $9.95 to $13.95 a day—provided by the 1973 arrangement.

In the Hawaiian case the Board found "that Hawaiian has made every effort to insure that it paid for only its fair share of the Hawaiian-Hertz fly-drive arrangement . . . [T]here is no evidence to indicate that the money Hawaiian expended on this program was . . . out of proportion to the benefits received from this arrangement with Hertz." (J.A. 664) Although in this case Aloha paid the entire cost of the fly-drive advertising program there is no showing that this payment was out of proportion to the benefits received by Aloha. There is no evidence that Aloha paid any more than it would have paid in any event to advertise its program. Moreover, the ALJ found that Budget paid for advertising its own rent-a-car offers and services.

In summary, the 1973 Aloha-Budget arrangement appears to have been a legitimate joint business venture in which each company sought an increase in business and each contributed to a joint promotion, Aloha by paying for advertising and Budget by reducing its rates for Aloha's passengers. Each party benefitted by attracting more business.

There is no substantial evidence translating Aloha's contributions to Budget's advertising expenses into Budget's discounts to Aloha's passengers who rented cars. The Board could not properly find that the air carrier—Aloha—refunded fares to its passengers. Accordingly, we must set aside the Board's finding that the 1973 arrangement was in violation of section 403(b) of the Act.

Finally, Aloha attacks the Board's finding that the discount practices were discriminatory, in violation of section 404(b) of the Act, 49 U.S.C. § 1374(b). That section provides in relevant part that "[n]o air carrier . . . shall . . . subject any particular person . . . to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." The ALJ found the arrangement discriminatory because

As between fare-qualified passengers who used the fly-drive package, on the one hand, and fare-qualified passengers who elected not to use the package or passengers not qualified by fare, on the other hand, the arrangement was in the nature of a tie-in such as the Board found to be unjustly discriminatory in *Tour Basing Fares,* 14 C.A.B. 257 (1951). That is, in order for the Aloha passenger to obtain air transportation at the lower cost . . . he had to purchase a package consisting of the air transportation and a rental car.

(J.A. 518) The ruling was confirmed by the Board.

▮▮▮▮ At the outset Aloha contends there was a fatal variance between the allegations of the complaint and the proof and ruling with respect to discrimination. This is so, says Aloha, because the decision broadly found unjust discrimination against passengers unable or ineligible to use the fly-drive program, whereas the complaint charged only discrimination between round-trip and one-way passengers.

We are not persuaded by Aloha's procedural argument. Pleadings in administrative proceedings are not judged by the standards applied to an indictment at common law. It is sufficient if the respondent "understood the issue" and "was afforded full opportunity" to justify its conduct during the course of the litigation. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 350, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); *Tashof v. FTC,* 141 U.S.App.D.C. 274, 437, F.2d 707, 713 (1970); *Kuhn v. CAB,* 87 U.S.App.D.C. 130, 183 F.2d 839, 841–42 (1950); *Swift & Co. v. United States,* 393 F.2d 247, 252 (7th Cir. 1968). Thus, "the question on review is not the adequacy of the . . . pleading but is the fairness of the whole procedure." 2 K. Davis, Administrative Law Treatise, § 8.04 at 525 (1958).

Here, as the ALJ noted, the complaint raised the question of unequal treatment of Aloha passengers under the fly-drive arrangement, and the entire issue was fully litigated in the course of the proceedings before the ALJ and the Board. The Bureau of Enforcement argued that Aloha, by limiting discount rentals to full-fare and round-trip passengers, unlawfully discriminated against passengers not in those categories and against eligible passengers unable to use a rental car. Aloha contended that the issue should be limited to the specific allegations of the complaint, but went on to argue that no aspect of the fly-drive arrangement resulted in unjust discrimination. Any "possibility of doubt" as to the issue was removed in the course of the proceedings. *See Northwestern Bell Tel. Co. v. Nebraska Ry. Comm.,* 297 U.S. 471, 476, 56 S.Ct. 536, 80 L.Ed. 810 (1936).

In any event, Aloha has demonstrated no prejudice from the alleged defect in the complaint. The determination of unjust discrimination was based on facts reflected in the evidence and not the subject of any dispute. Aloha challenges only the Board's legal conclusion of unjust discrimination; it does not question the factual findings on which the conclusion was based. Moreover Aloha tells us of no new evidence it might have introduced had it been given a more precise notice of the charge.

On the merits, Aloha notes that the Board's decision relied upon *Tour Basing Fares,* 14 C.A.B. 257 (1951). In that case the Board found unjustly discriminatory a "tie-in" arrangement by which passengers were required to purchase land accommodations to obtain a reduced fare to South America. Aloha argues that this holding has been "completely eroded" by subsequent decisions permitting other tour basing fares. Aloha directs our attention to *Group Inclusive Tour-Basing Fares to Hawaii,* 54 C.A.B. 534 (1970) and *United Air Lines, Inc.,* Order 77–12–24 (1977). In those cases however the Board found that "development and competitive" factors justified the challenged fares, which were therefore not "unjustly discriminatory". Specifically, in *Group Inclusive Tour-Basing Fares to Hawaii, supra,* the Board concluded that the fares in question would stimulate "overall" traffic levels by attracting the vacation traveler who would not travel by air absent availability of low-fare service coupled with inclusive ground service, and that the fares were necessary to meet the competition from supplemental charter carriers offering inclusive tour charters. *See also IATA Agreements Relating to Transatlantic Fares,* 53 C.A.B. 266, 275, 276 (1970). In the *United Air Lines* case the Board dismissed a challenge to a provision for a fare refund if on the day of a passenger's arrival at a ski area less than 50% of ski lifts at that area were in operation due to poor snow conditions. It appeared that the 1976–77 ski season was depressed due to poor snow conditions and that United's proposal "would stimulate travel to these ski markets during the 1977–78 season." *United Air Lines, Inc., supra,* at 1.

In Aloha's case no promotional or competitive factors appeared to justify the discrimination in fares. In fact the only justification was that the fly-drive arrangements would increase Aloha's revenues; and as the Board concluded in *Tour Basing Fares* this was not a sufficient justification for a discriminatory fare.

■■ There is discrimination in violation of section 404(b) "when different fares or rates are charged for like and contemporaneous services under substantially similar circumstances and conditions." *Group Inclusive Tour-Basing Fares to Hawaii, supra*, 54 C.A.B. at 453; *Free and Reduced-Rate Transportation Case*, 14 C.A.B. 481, 483 (1951). As this statement indicates, unequal fares are not invariably unlawful. Higher fares may be justified by the provision of substantially more or better services at higher costs. *See United Custom Coach, Suspension and Investigation*, 26 C.A.B. 23, 24 (1957). Lower fares may be justified by cost savings inherent in a particular type of service. *See IATA Agreements Relating to Transatlantic Fares*, 53 C.A.B. 266, 271–75 (1970). A reduced fare may be permissible because it has a salutory effect on competition. *Group Inclusive Tour-Basing Fares to Hawaii, supra*, 54 C.A.B. at 436; *Passenger Credit Plans Investigation, supra*, 37 C.A.B. at 408, 410; *Tour Basing Fares, supra*, 14 C.A.B. at 258–59. None of these considerations was present to justify the rate differential set up by the 1971 Aloha-Budget agreement; it cannot be explained on a cost theory, for that would dictate higher, not lower, rates for passengers receiving discounts on rented cars, and any boon to legitimate competition escapes us.

■ A variant fare may also be validated by the imposition of risks or restrictions substantially distinguishing the discounted service from other services. For example, in *Delta Air Lines, Inc. v. CAB*, 147 U.S. App.D.C. 272, 455 F.2d 1340 (1971), we held that lower fares charged by Eastern Airlines for its "conditional reservations" were not discriminatory within the meaning of section 404(b). Under the conditional-reservations plan, the Eastern ticketholder would be placed on the flight of his choice after all first-class and coach passengers were seated and before any standby passengers boarded. *Id.* at 274, 455 F.2d at 1342. He was not guaranteed a seat on the flight; rather, he could be "bumped" onto the next available flight in which event Eastern would refund to him the cost of the first leg of his journey. *Id.* Thus the ticketholder incurred the risk of delay in exchange for a lower fare and the chance that part of his journey would be subsidized by the airline. We held that this fare was permissible because the conditional reservation provided a service quite different from ordinary reservation of first-class or coach service and the fare package was fully open to all passengers. *Id.* at 275–76, 455 F.2d at 1343–44. *See Refund for Poor Skiing Conditions Proposed by United Airlines, Inc.*, Order 77–12–24 (Dec. 2, 1977).

Here, the Board held that the discount absorbed by Aloha under the 1971 agreement on rentals of Budget cars constituted a refund to passengers by Aloha, and we have sustained that determination. It thus is clear that while the arrangement was in effect, passengers who elected to rent cars paid less for the same service than passengers who did not avail themselves of the car-rental opportunity. Because different fares were thus charged, the situation was not like one in which all passengers pay the same fare but some choose not to partake of air-transportation services—such as meals and baggage handling—which are equally available to all and legitimately provided under the fare pursuant to a filed tariff. *Cf. Passenger Credit Plans Investigation, supra*, 37 C.A.B. at 408, 413.

■ Because the discounted Aloha fare was not justified by cost or competitive factors, it can survive only if, as in the *Delta* case, the restrictions or risks imposed on the passenger resulted in a different service. Under the 1971 arrangement, however, a passenger secured the benefit of a reduced fare merely by renting a car from Budget. Like the requirement that the passenger purchase ground accommodations in order to qualify for a cheaper fare, this car-rental requirement did not create a different class of service for which a different rate could properly be charged. *See Tour Basing Fares, supra*, 14 C.A.B. at 268. Accordingly, we affirm the Board's finding of a violation of section 404(b) by the 1971 arrangement.

As we have demonstrated the 1973 arrangement did not violate section 403(b) of the Act; in other words there were no illegal fare rebates pursuant to the 1973 arrangement. This being so, it logically follows that there was no discrimination in fares. All passengers who flew the same route and paid the same fare had an equal opportunity to rent a car from Budget at a discount. Likewise, in the absence of illegal rebating or fare discrimination there could be no violation of section 411 of the Act. We therefore reverse the Board's decision that the 1973 arrangement was in violation of the Act.

Except for the decision that the 1973 agreement violated the Act the Board's order is affirmed.

*So ordered.*