**FIRST AMERICAN BANK OF VIRGINIA, Petitioner,**

v.

**Elizabeth Hanford DOLE, Secretary of Transportation, Respondent.**

**American Bankers Association and Virginia Bankers Association, Amici Curiae.**

**No. 84–1901.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1985.

Decided June 6, 1985.

Bryan Jay Yolles, Washington, D.C. (Robert A. Altman, Philip H. Hecht, Clifford & Warnke, Washington, D.C., Terrence Ney, James M. Lewis, Boothe, Prichard & Dudley, Fairfax, Va., Warren T. Braham, Senior Vice President, First American Bank of Va., on brief), for petitioner.

Thomas L. Ray, Asst. Gen. Counsel Litigation, Washington, D.C. (Richard B. Dyson, Acting Gen. Counsel, Barry L. Molar, Civil Aeronautics Bd., J. Paul McGrath, Asst. Atty. Gen., John J. Powers, III and Frederic Freilicher, Dept. of Justice, Washington, D.C., on brief), for respondent.

(John J. Gill, Michael F. Crotty, Washington, D.C., John W. Edmonds, III, Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for amici curiae.

Before HALL, ERVIN and SNEEDEN, Circuit Judges.

ERVIN, Circuit Judge:

The petitioner, First American Bank of Virginia ("First American"), seeks reversal of Civil Aeronautics Board ("CAB") Order 84–8–40 rendered on August 9, 1984.[1] The Order reversed the CAB's Chief Administrative Law Judge's ("ALJ") finding in his Initial Decision that First American complied with all applicable CAB charter regulations as the depository bank for charter flights operated by Davis Agency, Inc. ("Davis") in 1982. In short, the Board found that by not adequately monitoring Davis' deposits of charter participants' funds, First American violated CAB charter regulations. Consequently, the Board assessed First American $30,000 in civil penalties.

On appeal, we are first presented with the argument of amici curiae[2] that the CAB did not have jurisdiction to assess civil penalties against First American under the Federal Aviation Act, 49 U.S.C. § 1471 (1982) ("FAA"). Second, First American contends that the Board's order reversing the ALJ's findings was based on an erroneous interpretation of the CAB's charter regulations. Because we conclude that the Board's order placed a higher standard of care on First American to safeguard charter fund deposits than is required under the CAB's own regulations and applicable state law, we reverse and direct the Board to adopt the ALJ's decision.

To protect the public from unscrupulous travel agencies, the CAB's charter regulations require a tour operator to file a prospectus with the Board before selling or advertising a charter flight. 14 C.F.R. § 380.25 (1984). The CAB requires the charter prospectus to include: (1) a proposed charter flight schedule; (2) a statement that the tour operator has entered into a depository agreement with an air carrier and a depository bank; and (3) a statement indicating that the depository bank has received a copy of the tour operator's proposed charter flight schedule. Id. § 380.28. More important, the CAB's charter regulations also require a tour operator to make various financial arrangements to ensure that charter participants' funds are adequately protected whenever a charter program is cancelled by a tour operator. One such financial arrangement is the CAB's requirement that a tour operator

---

1. By statute, the CAB no longer exists as a separate federal agency. 49 U.S.C. § 1551 (Supp. II 1984). The CAB's authority to regulate charter tour operators was transferred to the United States Department of Transportation on January 1, 1985. Id.

2. The American Bankers Association and the Virginia Bankers Association filed a brief as amici curiae. The jurisdictional issue is raised only by the amici curiae. First American chose not argue that the CAB had no jurisdiction to assess civil penalties against it for the violation of the CAB's charter regulations regarding depositor banks.

enter into a depository agreement with an airline and a depository bank. *Id.* § 380.-34(b)(2). These depository agreements specifically require a tour operator (such as Davis) to deposit charter participants' funds into a depository bank. *Id.* Once deposited, the depository bank is required to maintain a separate accounting for all funds deposited by each charter group. *Id.* § 380.34(b)(2)(VII).

In 1977, the CAB proposed amending its charter regulations to impose more substantial, affirmative duties upon depository banks. *See* 42 Fed.Reg. 61,408, 61,411, 61,-412, 61,415 (1977). Pertinent to this case, the Board proposed a requirement that depository banks report any knowledge they might have concerning violations of charter regulations by tour operators. *Id.* at 61,-145. In addition, the CAB solicited comments on whether the Board should promulgate a rule to prohibit depository banks from accepting checks representing charter participants' payments that are not payable to the bank. *Id.* at 61,412.

The public comments filed with the Board criticized the proposed regulations for effectively requiring depository banks to ensure that tour operators fully complied with the charter regulations. Consistent with this critical view, one bank commented:

> The CAB's proposed regulations sought to place an affirmative duty of inquiry on the bank as to the fulfillment of the charterer's or direct air carrier's obligations, something well beyond the usual functions of an escrow holder. The bank has no control over the terms of the charter's and air carrier's arrangements and is not likely to have actual knowledge of how those terms are being carried out.

Comments of Barclays Bank of California, CAB Docket 31735 (June 27, 1978). Responding to this criticism, the Board deleted those sections of the proposed charter regulations that placed additional, affirmative duties on depository banks to oversee regulatory compliance by tour operators. *See* 44 Fed.Reg. 12, 971 (1979).

To assist tour operators in their attempts to comply with charter regulations, the CAB has published an information packet which describes the procedures for filing a charter program under the Board's regulations. That information packet contains a sample depository agreement intended to provide tour operators with an easy manner of compliance. The sample depository agreement forms also expressly provide that each agreement is governed by and construed under applicable state law. Each depository agreement entered into by First American and Davis for the 1982 charter season was based on the CAB's sample form agreement.

### I.

### Factual Background

Davis is a travel agency that operates charter programs for flights between the United States and various destinations in Europe. To comply with the CAB's charter regulations, Davis established depository escrow accounts for charter participants' funds at First American and its predecessor bank, Clarendon Bank & Trust Company, between May, 1977 and January, 1982. During this period, these escrow accounts were apparently maintained by First American without any irregularities or violations of the charter regulations. Because of a change in management, however, Davis began to experience serious administrative and managerial difficulties in early 1982. Most prominent among the problems resulting from this managerial change was Davis' misdeposit of funds intended for various escrow accounts into its own general commercial account at First American.

On approximately April 12–15, 1982, First American received by mail a series of certificates from Pan American Airlines ("Pan Am") confirming that payments for various charter flights organized by Davis were due to Pan Am. At first, Pan Am's request for payment confused First American because (1) no depository agreement between Pan Am and First American had yet been signed at the time the certificates

were received; (2) there were no funds in the Pan Am escrow account; and (3) First American had not received payment requests from any charter air carrier since at least 1979 in accordance with Davis' regular practice of paying air carriers directly from its own funds, rather than from charter participants' funds deposited into escrow accounts at First American. Due to Pan Am's unexpected payment request, First American *immediately* questioned Davis to determine why Pan Am had sent the certificates directly to First American. Davis informed First American that the certificates requesting payment had been inadvertently and mistakenly sent by Pan Am to First American. According to the ALJ, "Davis officials assured the Bank that there was no problem and that there simply had been a misunderstanding by Pan Am." (JA 71).

Somewhere around May 10–12, 1982, First American received another series of certificates from Pan Am requesting payment for the charter flights it was obligated to perform for Davis. As before, First American was again confused by Pan Am's additional requests for payment. As a consequence, First American officials met and determined that a meeting with Davis officials was necessary. First American promptly notified Davis that at their proposed meeting they intended to discuss the uncertain status of Davis' escrow accounts. Davis officials informed First American, however, that they could not meet to discuss the status of their escrow accounts until May 27, 1982. On this date, the meeting First American had sought since early May was finally held.

At this meeting, First American requested that Davis prepare a list for each charter group of the funds Davis had collected from charter participants. First American also demanded an accounting from Davis of all charter participants' funds collected for the 1982 season. Following the May 27th meeting, First American and Davis met on numerous occasions and had frequent telephone conversations in an ongo-

ing effort to resolve questions regarding Davis' escrow accounts. At a meeting on June 16, 1982, First American told Davis that it would establish a special escrow holding account for all charter participants' funds. Immediately following that meeting, First American began to require Davis to deposit into escrow accounts all charter passengers' funds that should have been deposited initially in those accounts but had been instead diverted to Davis' operating accounts.

Even after the June 16th meeting, First American continued to utilize the general escrow holding account and others to remedy Davis' misdeposits. Further, First American assigned its personnel to monitor all of Davis' accounts. Despite these efforts by First American, Davis continued to misdeposit charter participants' funds. Equally troublesome, some charter participants' checks did not indicate the charter flight to which the check was to be applied. Those checks indicating particular flights were deposited by First American into their proper escrow accounts. Any checks not properly earmarked for a particular flight account were deposited in the general escrow holding account. Each time First American discovered that Davis had misdeposited charter passengers' checks into its general operating account, the checks were redeposited into their proper escrow account and the general operating account was debited.

As a result of First American's actions, no passengers from Davis' 1982 charter program were stranded or lost any money. Each of Davis' charter participants received a full refund from additional funds that First American had preserved and deposited with the United States District Court for the Eastern District of Virginia in an interpleader action initiated by First American. *See First American Bank of Virginia v. Davis Agency, Inc.*, No. 83–2040–A (E.D.Va. Aug. 3, 1984). First American ultimately terminated its banking

relationship with Davis on August 11, 1982.[3]

## II.
## The Proceedings Below

On January 27, 1983, the CAB filed a complaint against First American alleging that by "repeatedly permitt[ing] charter participants' funds to be deposited" by Davis into non-escrow accounts, First American violated the CAB's charter regulations under 14 C.F.R. § 380.34(b)(Q) (1984). The complaint further asserted that "by late April 1982" First American "knew or should have known" that Davis had misdeposited charter participants' funds into non-escrow accounts.[4]

At the close of discovery, First American moved for summary judgment and the CAB responded by filing a cross-motion for summary judgment. After reviewing the record and these motions, the ALJ in his Initial Decision concluded that First American had complied with all of the CAB's charter regulations. According to the ALJ, "First American [did not] knowingly, intentionally, or willfully" permit Davis to misdeposit its charter funds into the wrong escrow accounts. (JA 299). Although the ALJ determined that Pan Am's initial request for payment gave First American constructive notice of Davis' misdeposits by April 15th, he nevertheless concluded that First American's later conduct satisfied its obligation to take prompt remedial action.

The ALJ interpreted the charter regulations and the sample depository agreement to merely require depository banks such as First American to "maintain a separate accounting for each charter group." 14 C.F.R. 380.34(b)(2)(VII) (1984). The ALJ rejected the CAB's argument that the charter regulations placed a duty upon First American to act as a fiduciary by monitoring and policing Davis' deposits to ensure that they were deposited in their proper escrow accounts. Because the ALJ refused to require depository banks to monitor charter participants' funds, he found that between April 15th and June 17th First American "acted with diligent [sic] due and proper dispatch in taking corrective measures." (JA 294). The ALJ finally concluded, therefore, that First American did not violate 14 C.F.R. § 380.34(b)(2) (1984).

The CAB's Enforcement Division ("Division") petitioned the Board for discretionary review of the ALJ's Initial Decision. The Board granted review and held that First American violated 14 C.F.R. § 380.34(b)(2) (1984). The Board agreed with the ALJ's finding that First American received constructive notice on April 15th of Davis' misdeposits. The Board disagreed, however, with the ALJ's conclusion that First American's actions between April 15th and June 17th were adequate. After interpreting the charter regulations to make "the Bank a fiduciary responsible for safeguarding the payments of the charter purchases," (JA 158), the Board concluded that:

[T]he Bank should have acted promptly to find out where the missing funds were and to recover them. In addition, since Davis had commercial accounts at the Bank, the Bank should have begun examining at least a sample of Davis' commercial deposits to see if charter payments were included in those deposits.

... We agree that the Bank's handling of the escrow accounts after June 15 was praiseworthy, but the Bank took *too few steps* to enforce the escrow requirements in the preceeding two months, despite its knowledge that Davis was not following escrow requirements.

Order No. 83-1-99, Docket 41078 (Jan. 26, 1983).

---

**3.** In the fall of 1982, the CAB's Enforcement Division investigated Davis' 1982 charter program. Although this investigation exonerated First American, Davis and other account holders were found to have violated the charter regulations. Accordingly, the CAB assessed Davis civil penalties totalling $60,000. *See* Consent

**4.** The CAB's complaint sought $500,000 in civil penalties against First American. The ALJ considered this large sum to be "unjust" and "abusive."

(JA 360) (emphasis added). Consequently, the Board reversed the ALJ's Initial Decision and assessed First American substantial civil penalties.

### III.

### The CAB Properly Exercised Jurisdiction

Amici curiae argue that First American could not possibly have violated the CAB's charter regulations "because the rules of the [CAB] by their own terms, do not apply to banks, and by statute cannot be made to apply to banks." (Brief of Amici Curiae at 6). As a result, they assert that the CAB lacked jurisdiction to assess civil penalties against First American for any violations of its charter regulations. We disagree.

█ Because First American did not contest the CAB's jurisdiction in any of the proceedings below, the Board first argues that we are without power to consider this question under 49 U.S.C. § 1486(e) (1982). That section of the Federal Aviation Act provides:

No objection to an order of the Board shall be considered by the courts unless such an objection shall have been urged before the Board or if it was not so urged, unless there were reasonable grounds for the failure to do so.

*Id.* This provision of the FAA is merely an exhaustion of remedies requirement designed to ensure that administrative "'problems have been fully aired and focused in the proceedings below.'" *Cohen v. CAB,* 657 F.2d 999, 1003 (8th Cir.1981) (quoting *Air Line Pilots Association International v. CAB,* 502 F.2d 453, 457 (D.C.Cir.1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975)); *see also Aloha Airlines, Inc. v. CAB,* 598 F.2d 250, 259 (D.C.Cir.1979). Section 1486(e) of the FAA does not, therefore, preclude appellate consideration of a jurisdictional question not contested before the CAB because "a reviewing court may consider a challenge to an agency's power or jurisdiction even if it was not raised before the agency." *Railroad Yardmasters of America v. Harris,* 721 F.2d 1332, 1338 n. 19 (D.C.Cir.1983); *accord Washington As-*

*sociation for Television and Children v. FCC,* 712 F.2d 677, 682 n. 8 (D.C.Cir.1983); *see also Manual Enterprises, Inc. v. Day,* 370 U.S. 478, 499 n. 5, 82 S.Ct. 1432, 1443 n. 5, 8 L.Ed.2d 639 (1962) (Brennan, J., concurring). As a consequence, we have the power to consider whether the CAB had jurisdiction to assess First American civil penalties.

█ Simply put, the argument that the CAB has the authority only to regulate air carriers and not banks under the FAA is unpersuasive. By providing that "[a]ny person who violates any provision ... of this Act, or any rule, regulation, or order issued thereunder ... *shall* be subject to a civil penalty," the FAA grants the CAB broad enforcement powers that are not limited to air carriers. 49 U.S.C. § 1471 (1982); *accord CAB v. Tour Travel Enterprises,* 440 F.Supp. 1265, 1267 (N.D.Ill. 1977), *vacated on other grounds,* 605 F.2d 998 (7th Cir.1979) ("Section 1487(a) does not limit the Board's enforcement powers to air carriers."). The Seventh Circuit has already rejected the argument that depository banks are beyond the CAB's regulatory powers on the ground that

a reading of both the statute and the Special Charter Regulations [reveals] that the use of a depository bank ... was a contemplated and necessary element in effectuating the stated purpose of providing for proper security under strict controls.... [A bank] cannot escape its federally enforceable duties on the grounds that it is not specifically mentioned in the statute which enabled the CAB to regulate as it did.

*Bratton v. Shiffrin,* 585 F.2d 223, 229 (7th Cir.1978), *vacated,* 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979), *aff'd on rehearing,* 635 F.2d 1228 (7th Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981).

Manifestly, "Congress envisioned that [charter passengers] were to be protected from air travel abuses by means of the [depository] bank's adherence to federal regulations." *Id.* We refuse to frustrate

that clear congressional goal by unduly limiting the CAB's regulatory and enforcement powers to air carriers alone. Such a strained interpretation of the FAA would seriously hamper the CAB's regulatory attempts to protect charter passengers from flight cancellation without reimbursement by their tour operator. Limiting regulation to charter tour operators cannot accomplish the CAB's goal of adequately protecting charter passenger funds in the event of cancellation. We are firmly convinced, therefore, that the CAB had jurisdiction to regulate depository banks and assess First American civil penalties for the violation of its regulations.

## IV.

### First American's Compliance With The CAB's Charter Regulations

The Board asserts that First American had an affirmative duty under the CAB's charter regulations to monitor Davis' deposits after receiving constructive notice that something was amiss with the Pan Am account on April 15, 1982. We cannot agree and instead conclude that First American's conduct after April 15th under the Board's regulations was both reasonable and proper.

Under the CAB's charter regulations, depository banks have a duty to "maintain a separate accounting [of charter passengers' funds] for each charter group." 14 C.F.R. § 380.34(b)(2)(VII) (1984). No other duty is clearly placed upon depository banks by these regulations.[5] As a conse-

quence, applicable state law and general banking practices must be our guide. In this case, the depository agreements between First American and Davis specified that the laws of Virginia and New York governed. The duty of a depository bank in Virginia has been stated as follows:

> Every time the word trustee, agent, or executor appears upon a check or draft, it is not the duty of the bank to make inquiry. To place the burden of supervising all such accounts upon a bank of deposit would be unreasonable, and one of which few institutions, if any, would be willing to assume.... [W]hen the bank has no actual or constructive notice of fraud or misdoing on the part of the fiduciary, who is one of its depositors, if the bank, acting in good faith, merely credits the personal account of the fiduciary with the checks, this does not make the bank liable if the fiduciary afterwards misappropriates the deposit. In order to render a bank liable for misappropriation by a fiduciary of a trust fund deposited in the bank, the bank must have *actually participated* therein, or, with knowledge, reaped some *benefit* therefrom, such as receiving it in payment of the indebtedness of the fiduciary to the bank.

3 A *Michie's Jurisprudence: Banks and Banking* § 58 (1976) (emphasis added).

Similarly, the rule in New York is that a depository bank is "under no duty to exercise vigilance to protect the trust estate from possible embezzlement." *Grace v. Corn Exchange Bank Trust Co.*, 287

---

**5.** The conclusion that the CAB's current charter regulations do not place any affirmative duties upon depository banks to monitor charter deposits is supported by an examination of the CAB's *proposed* requirements for depository banks that were ultimately rejected. The proposed regulatory changes would have imposed the following requirements on depository banks:

(1) The depository bank must acknowledge its liability to participants for any losses attributable to the bank's failure to comply with any of the applicable regulations.
42 Fed.Reg. 61, 411 (1977).
(2) The depository bank is prohibited from accepting payments 'in the escrow account'

that are not made payable to the bank. The bank must return improperly drafted payments to their makers.
*Id.* at 61, 412.
(3) The depository bank must report any violation of the Board's charter rules of which it 'has knowledge.'
*Id.* at 61, 412.
These proposed regulations plainly place upon depository banks the very duty that the CAB now argues already exists under current regulations. If that is indeed the case, there would have been no reason for the CAB to have proposed any regulatory changes. We cannot believe that the CAB's proposed regulations were utterly superfluous.

N.Y. 94, 102, 38 N.E.2d 449, 452 (1941). Further, depository banks are entitled to presume that the trustee will apply all trust funds exclusively to their trust purposes despite their initial deposit into a personal account. *Bischoff v. Yorkville Bank*, 218 N.Y. 106, 111, 112 N.E. 759, 760 (1916). Therefore, it is clear under state law that unless a depository bank actually participates in or reaps some benefit from a fiduciary's misappropriation of funds, the bank is not liable.

▉ Reviewing First American's conduct after it received constructive notice of Davis' misdeposits on April 15th, we find that the Bank satisfied the applicable state law standard of care for depository banks. First American neither participated in nor reaped any benefit from Davis' misdeposits. Therefore, First American merely had a duty to exercise ordinary care to determine the origin of any possible irregularities in Davis' deposit practices.

Pan Am's direct request for payment from First American revealed a possible irregularity in Davis' charter deposits. This imposed a duty of inquiry upon First American which it satisfied by immediately questioning Davis to determine the reason for Pan Am's payment request. First American justifiably relied upon and reasonably believed Davis' initial explanation that Pan Am had mistakenly requested payment. Nevertheless, the Board found that because First American waited two weeks for Davis' response to its inquiry, the Bank's actions after April 15th were not adequate under the charter regulations. But because First American had maintained a long and trouble-free banking relationship with Davis, the Bank had no reason to presume that Davis had been misdepositing its charter participants' funds. After Davis' first explanation, First American could not have known without clairvoyance that Davis was misdepositing charter participants' funds into its own general operating account.

During May, 1982, First American's inquiries became more frequent and demanding. These demands eventually resulted in a meeting between Davis and First American at the latter's request on May 27th. At this meeting, First American requested additional accounting information from Davis to pinpoint what irregularities had occurred. Eventually another meeting was held on June 16th at the conclusion of which First American began taking affirmative measures to correct Davis' misdeposits.

Because First American's remedial efforts after April 15th were substantial and prompt, we believe the Bank acted with greater diligence than the CAB's charter regulations demand and with greater vigilance than state law commands. The quasi-criminal nature of civil penalties counsels caution and pause before we resort to such a drastic remedy.[6] However, the CAB never exercised the caution and circumspection so clearly called for when it imposed civil penalties on First American for the viola-

---

**6.** Civil penalties may be considered "quasi-criminal" in nature. *Pollgreen v. Morris*, 579 F.Supp. 711, 717–18 (S.D.Fla.1984); *United States v. Sanchez*, 520 F.Supp. 1038, 1040 (S.D.Fla.1981), *aff'd mem.*, 703 F.2d 580 (11th Cir.1983). Where civil penalties may be imposed, therefore, "individuals and organizations [must] be specifically put on notice of [possible] government sanctions before they are levied." *United States v. Rust Communications Group, Inc.*, 425 F.Supp. 1029, 1033 (E.D.Va.1976). The requirement of notice is principally designed to give fair warning to persons or organizations subject to administrative sanctions. Regarding the requirement of adequate notice, the Fifth Circuit has explained that "statutes and regulations which allow monetary penalties against those who violate them, ... must give ... fair warn-

ing of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976) (citation omitted); *accord Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1332 (9th Cir.1982); *In re Metro-East Mfg. Co.*, 655 F.2d 805, 810 (7th Cir.1981). Because civil penalties could be imposed, the need for clarity in the CAB's charter regulations was greater than in the usual case where no such sanction is available. First American was entitled to clear notice of any duty it supposedly had under the charter regulations to monitor Davis' deposits. That notice was never provided.

tion of a duty that its own regulations neither contemplated nor established. Although a regulation requiring depository banks to monitor charter deposits may be desirable and salutary, we cannot retroactively impose such a duty.[7] That duty must await another day and another regulation.

First American's conduct was entirely reasonable and proper under the CAB's charter regulations. Accordingly, we reverse and direct the Board to enter an order affirming the ALJ's Initial Decision.

REVERSED.

---

**7.** Our view of the wisdom of a particular duty that an agency seeks to impose upon private parties is of no consequence. Courts merely recognize and enforce already existing regulatory duties, we do not create them. The judicial role is limited to enforcement because " '[t]he responsibility to promulgate clear and unambiguous standards is upon' " the administrative agency alone. *In re Metro-East Mfg. Co.,* 655 F.2d at 810 (quoting *Marshall v. Anaconda Co.,* 596 F.2d 370, 377 n. 6 (9th Cir.1979)). Only the CAB, therefore, can impose a duty requiring depository banks to monitor charter deposits by properly exercising its rule-making authority. Promulgation and not adjudication is the proper way to establish regulatory duties.